RESERVE VAULT CORP. *v.* JONES.

5-2625                                          356 S. W. 2d 225

Opinion delivered April 16 1962.

*Wayne Foster,* for appellant.

*Frank Holt,* Attorney General, by *Jack L. Lessenberry,* Asst. Attorney General, for appellee.

CARLETON HARRIS, Chief Justice.   This litigation involves the validity of Act 78 of 1961, entitled, ''An Act Relating to Prepaid Funeral Expenses; Requiring Registration of Organizations Dealing Therein and Requiring the Establishment of Trusts for the Benefit and

Protection of Purchasers of Such Contracts.'' The provision particularly under attack is Section 5, which reads as follows:

"SECTION 5. After the effective date of this Act, all funds collected under contracts for prepaid funeral benefits, including funds collected under contracts made before the effective date of this Act, shall be placed in a state or national bank, or building and loan association in this State and so deposited not less than thirty days after collection, to be held in a trust fund in this State for the use, benefit and protection of purchasers of such contracts. Any withdrawals from such trust fund shall be accompanied by a certified copy of the death certificate, together with proper affidavits as may be required by the Securities Division of the State Bank Department, before such funds shall be released in fulfillment of the contract. In no event shall more funds be withdrawn from the trust account than are originally placed into the fund under any one contract, other than through the payment of accrued interest thereon.''

Appellant, Reserve Vault Corporation, is engaged in selling fiberglass grave vaults[1] to the general public, under a procedure sometimes referred to as ''pre-need'' contracts. Appellant Washington is one of the salesmen for the corporation. The company has been selling these vaults under two contracts, herein referred to as contract "A", and contract "B". Prior to the passage of Act 78, approximately one hundred such vaults had been sold at an average price of $195 each. Under an agreement between the corporation and its salesmen, Washington was to receive a commission of 25% of the selling price of each vault sold by him. Practically all of the contracts under which the vaults were sold provided that the selling price would be paid in monthly payments, and the salesmen were to receive the first 25% of monies paid in. Washington, as salesman for appellant company, made the sale of a vault to Mrs. Leaether A. Bailey on November 10, 1960, for a total consideration

---

[1] The sale of grave vaults is covered under Section One of the Act.

of $190, of which $5 was paid in cash, and the balance was to be paid in thirty-seven equal monthly installments in the amount of $5 each. This sale was made under contract "A", pertinent portions of which read as follows:

"The said vault(s) are sold subject to the following conditions which are hereby agreed to by the parties:

The company agrees to deliver the grave vault or vaults purchased under this contract to any place designated by the purchaser within the State of Arkansas. Purchaser or someone acting for purchaser hereby agrees to notify corporation immediately upon death whereby, the corporation will have a minimum of twenty-four hours notice prior to the delivery of the vault. Purchaser agrees to give a minimum of twenty-four hours notice that a vault is required and of the place and time of delivery. Corporation agrees to effectuate delivery within a twenty-four hour period after notice, however, the corporation shall not be liable for delays in delivery due to acts of God or conditions beyond the control of the corporation. Corporation agrees to maintain a separate account which shall be at least 50% of the amount of this contract. This reserve account shall be a restricted fund to assure performance by the corporation of its contract. Investments of this fund shall be made by the Board of Directors of the corporation."

On March 18, 1961, the company sold a vault to William and Pauline Dailey for the sum of $200.85, of which $5 was paid in cash, and the balance was to be paid in thirty-nine equal monthly installments of $5 each. This sale was made under contract "B", termed the "lay away plan", and pertinent portions read as follows:

"The corportion agrees to deliver grave vault or vaults purchased under this contract to any place designated by the purchaser within the State of Arkansas within a period of ten days subsequent to corporation's receipt of the final installment due under this contract, however, the corporation shall not be liable for delays

in delivery due to Acts of God or conditions beyond the control of the corporation."

Act 78, containing an emergency clause, became effective on February 13, 1961, and on March 23, appellants instituted suit in the Pulaski Chancery Court, seeking a declaratory judgment relative to the validity of Act 78. It was alleged that appellants were about to be adversely affected by the provisions of the Act, and that same was in contravention of both the Constitution of the United States, and the Constitution of the State of Arkansas. As an alternative, appellants prayed that if the Act be held constitutional, the Court enter its judgment finding that Act 78 had no application to the contracts herein involved, as being outside the purview of the Act. On trial, the Court held that Act 78 was a constitutional exercise of the police power of the State of Arkansas to regulate a business susceptible to fraudulent practices. The Court further held:

"3. That said Act does not unconstitutionally impair the contracts of plaintiff corporation with the defendant, Leaether Bailey, or the contract for commissions between plaintiff corporation and its salesman, plaintiff A. J. Washington.

4. That the contract noted as Exhibit "A" is within the purview of said Act.

5. That the contract described as Exhibit "B" from the testimony and evidence given at the trial is not within the purview of said Act.

6. That said Act is retroactive to include contracts executed prior to its enactment, but it is not the intent of said Act to require the payment into a trust fund of any collection made on the Leaether Bailey contract prior to the effective date of the Act, but does require the payment into a trust fund of all payments collected on said contract since the effective date of the Act, even though said collections be funds previously relegated by contract to the salesman, A. J. Washington, as a commission."

Judgment was entered accordingly, and appellants have appealed from that portion holding the Act constitutional, and finding that contract "A" is covered by the Act. The State has not appealed from that portion of the judgment finding that contract "B" is not within the purview of said Act. For reversal, appellants rely upon several points, which we proceed to discuss.

It is first asserted that the contract, here involved, is not controlled by the Act, and is beyond its scope and purview. In presenting this point, appellants first argue that the Act purports only to cover situations wherein delivery (of a vault) is dependent upon death, and, say appellants, the Bailey contract does not require the death of anyone as a condition precedent to delivery. We do not concur with this contention. We think this statement would be apt relative to contract "B", which on its face, only requires full payment of the purchase price before delivery can be demanded, but it is evident from the language of contract "A", that delivery is dependent upon a death. Again quoting the pertinent portion:

"Purchaser or someone acting for purchaser hereby agrees to notify corporation immediately upon death whereby, the corporation will have a minimum of twenty-four hours notice prior to the delivery of the vault. Purchaser agees to give a minimum of twenty-four hours notice that a vault is required and of the place and time of delivery."

We do not agree with appellant that a purchaser under this contract would be entitled to obtain a vault as soon as same was paid for. Appellants likewise argue that Act 78 relates only to contracts which are dependent upon the death of a "contracting party",[2] and that the contract in question certainly does not require the death of the contracting party. This same contention was made, and rejected, in the case of *Falkner* v. *Memorial Gardens Association*, 298 S. W. 2d 934. There, the Court of Civil Appeals of Texas passed upon an Act

---

[2] See Section One of the Act.

identical with the Act here in question. Relative to this contention, the Court said:

"Some contracts are doubtless made for the benefit of a third person or persons and are not necessarily dependent on the death of the actual contracting party. However, it is clear that they are made in contemplation of the death of the party benefited."

Of course, a purchaser might have in mind another member of his family when buying the vault, and it must be likewise considered that certainly, in numerous instances, the vault *would* be purchased for the benefit of the contracting party. Accordingly, if appellants' view were correct, the same exact contract would be sometimes within the purview of the Act, and sometimes without the purview of the Act, depending upon whether the contracting party purchased the vault in contemplation of his own death, or in contemplation of the death of some member of his family. Such an interpretation would leave the matter in total confusion, and would open the door to evasive practices. Actually a purchaser probably would not know for whom the vault was being acquired, the answer to that question depending upon which member of the family first died. At any rate, we find no merit in the contention, and hold that delivery of a vault, under contract "A", is conditioned upon a demand made pursuant to a death.

Appellants contend that the Act is an unwarranted and unlawful exercise of the police power, stating "the attempted regulation of the money received from the sale of personal property, merchandise or services, in the connection of the disposal of a dead human body is not a matter for the exercise of the police power." It is contended that to require appellant company to place the full purchase price in trust has no relation to the public health, safety, morals, or general welfare, especially in the absence of facts that appellant company is conducting a fraudulent business or is guilty of immoral or improper business practice. Appellants assert that the purchasers are adequately protected because the cor-

poration agrees, in the contract, to place a portion of the money paid in by each purchaser in a separate account to guarantee performance, *i.e.,* to guarantee delivery of the vault purchased. According to the president of the company, about one-half of the contracts sold provide for 50% of the money to be invested in this separate account, and about one-half provide for 15%. We do not agree with appellants' contention. The enactment of statutes for the purpose of prevention of fraud is within the police power of the state. *Stuart* v. *Elk Horn Bank & Trust Co.,* 123 Ark. 285, 185 S. W. 263. While it is true that there is no charge of fraud against the present ownership of the company,[3] allegations, or proof of fraud, has no bearing on determining the constitutionality of the statute. As set out in 16 C. J. S., Constitutional Law, § 198, p. 968:

"In determining the constitutionality of a statute bearing on its face clear indication that it was designed to prevent fraud, the court may not give weight to the fact that fraud was neither charged or proved."

We think unquestionably the Legislature, in passing the Act, had in mind the protection of the public; in fact, this is shown by the language appearing in the Emergency Clause. During the taking of the testimony of the president of Reserve Vault Corporation, it was developed that all shares of stock could, at any time, be sold to some presently unknown individual, who would have complete control of the company; it was further shown that the president has the right to withdraw all company funds simply by writing a check. Let it be borne in mind that many of these contracts will not mature for a long number of years, and vast changes in the status of the corporation and its personnel can well take place. In fact, the witness admitted that even a $1,000 claim against the company at present could not be met with company funds, since the corporation had only $700 in the bank. In the case of *Memorial Gardens Association,*

---

[3] This is a family corporation, all stock being owned by members of the family. The corporation was created with the minimum of $300 paid in capital.

*Inc.* v. *Smith,* 16 Ill. 2d 116, 156 N. E. 2d 587, the Supreme Court of Illinois said:

"Plaintiffs urge that the act constitutes an unwarranted exercise of the police power; and that it is confiscatory of plaintiffs' business and thereby violates the due process provisions of the State and Federal constitutions. We will first consider this contention. The police power is an attribute of sovereignty inherent in every government. It has been reserved to all the States by the constitution of the United States. (citing cases) While it is not without limitation and may not be exercised arbitrarily, the legislatures of the States have broad discretion in the passage of statutes in its exercise. (citing cases) When the legislature has considered a problem and enacted legislation thereon, the act is presumptively a valid exercise of the power and the burden rests upon the one assailing the statute to show that it is without reasonable basis and entirely arbitrary. (citing cases) The enactment of statutes having for their object the prevention of fraud, deceit, cheating, and imposition is within the police power of a State. (citing cases)

There can be no doubt that the act relates to a proper subject for the exercise of the police power. The public has a vital interest in the proper disposition of the bodies of its deceased members. * * * There is nothing unique in requiring one who contracts for performance *in futuro* to give security for that performance. Thus, legislation requires contractors in public construction to give performance bonds, and compels insurance companies to maintain certain reserves and deposit security with administrative authorities charged with the supervision of their activities. The use of such bonds is generally accepted, and it is well settled that the insurance business is affected with a public interest and subject to control by the State in the exercise of its police power. (citing cases)

The contracts here involved are analogous to a form of insurance. By payments made during life, the purchasers seek to insure their burial. The net effect is the

same as though a life insurance contract were purchased to provide a sufficient sum payable at death to accomplish that result. In the case of insurance, the right of the legislature to require reserves and the deposit of security is unquestioned. The trust fund provisions of the act in question are designed to accomplish the same purpose, that is, to assure the purchasers that the company will be able to complete their contracts when the time for performance arrives. When we consider that contract payments are to be made in a maximum of three years and that the average time until performance of the 'pre-need' contracts is almost 29 years, the justice of the legislation becomes evident. Plaintiffs, themselves, have recognized the need of some protection for the purchaser by including in their form of contract certain vague provisions relative to setting aside a trust fund. These illusory provisions furnish purchaser appeal, but fail to provide the protection which the situation warrants.''

Appellants complain that the Act is confiscatory, rather than regulatory, and actually has the effect of prohibiting the corporation from operating. Appellant corporation states that it cannot operate if it is required to place all monies collected in a trust fund; that this requirement precludes it from using any funds for operational expenses of the business, and likewise prohibits it from paying its salesmen the 25% commission on each sale until some time in the future. Appellant company states that each salesman will have to outlive the purchaser in order to collect his 25% commission. As was pointed out by the Court in the *Memorial Gardens* case, ''It would be most unusual to expect, or require, prospective purchasers to furnish or advance capital funds necessary for the operation of a business.'' The argument that the statute is confiscatory, rather than regulatory, was met by that Court as follows:

''Plaintiffs urge, however, that the act is prohibitory rather than regulatory; that, if refused the right to make the unauthorized deductions from the trust fund, they

will be unable to remain in business. They state that the immediate expenses, including commissions and general overhead items, make it impossible to deposit in trust the large amounts required by the act. * * * In the long interval between full receipt of the purchase price and contract performance, the opportunities for fraud are great and risk of insolvency, with consequent inability to perform, apparent. The suggestion that actual costs are a minor item and that the legislature should have required a smaller deposit is unimpressive under the circumstances. The main thrust of plaintiffs' argument is that the regulations of the act will prevent the operation of its business of 'pre-need' sales and that they will be compelled to cease business if forced to make sales only at the time of death. However, the act neither restricts plaintiffs' sales of such property at the time of death, nor prohibits 'pre-need' sales. * * *

We do not believe that the present statute operates to prohibit plaintiffs' legitimate business. It does regulate the manner in which the business may be conducted. Practically, plaintiffs will no longer be able to collect prospective profits in advance, without furnishing an adequate guarantee for performance. However, this does not prohibit the operation of this type of business. A large discretion is necessarily vested in the legislature to determine not only what the interests of the public welfare require, but what measures are necessary to secure such interests. (citing cases) Plaintiffs' argument amounts to an admission that they will be unable to compete with others who sell the same merchandise and services at the time of actual need. However, the public welfare need not be abrogated to enable an individual to carry on his business in the particular manner in which he has elected to proceed. The analogy which plaintiffs seek to draw between their contracts and retail sales made on the 'lay away' plan is fallacious. The 'lay away' sale contemplates performance within a relatively short period of time upon payment of the purchase price. Opportunities for fraud are negligible and remedies for nonperformance are readily available."

Likewise, the Court of Civil Appeals of Texas, in *Falkner* v. *Memorial Gardens Association, supra,* was presented with the same argument. Quoting from that Court's opinion:

Appellees say:

'The Act is fundamentally unconstitutional because it is confiscatory. It is not intended to be regulatory or give reasonable protection to that part of the public doing business with appellees. It is intended to put appellees out of business because by Section 5 it requires all of the funds paid under the agreement to be placed in a trust fund until delivery without any recognition for the current expenses of salesmen's commissions, office expenses in keeping records and making collections of installment payments, or developing and maintaining the memorial cemeteries in which the merchandise is placed.'

This complaint is largely a criticism of the Act. In *Glens Falls Ins. Co.* v. *Hawkins,* 103 Tex. 327, 126 S. W. 114, 115, Judge Brown said:

The policy of enacting the law, whether good or bad, was a question for the Legislature, and the courts cannot consider it.'

\* \* \* The fact that the Act requires all funds collected under the contracts to be deposited in a trust fund is a mode of regulation of the business and does not prohibit its conduct. The fact that the Legislature saw fit to impose on the business a regulation that to appellees may seem onerous will not render the Act unconstitutional because the Legislature acting in the public interest was authorized to impose regulations on the business that operates uniformly on all persons engaged in such business.''

Appellant company, in stating that the Act will prohibit it from doing business, apparently overlooks the fact that it is still permitted to enter into contracts under its ''lay away'' plan; in fact, the president of Reserve Vault stated that he could operate his business under

this last type of contract.[4] At any rate, we find that the Act is regulatory, rather than prohibitory.

Appellants next argue that even if regulation is proper, the present act goes beyond any actual necessity. This argument is closely related and interwoven to that just discussed, and the cases there cited dispose likewise of this contention. It might be added that this Act is, to some extent, more liberal than acts of some of our sister states,[5] in that it permits the company to withdraw the accrued interest. Furthermore, the Commissioner of the Securities Division of the State Bank Department is given some discretion in enforcement provisions, and his testimony before the court indicates a fair and reasonable interpretation of his duties.

Finally, appellants complain that the Act impairs the contract between appellant company and its salesman for any commission earned prior to the passage of the Act. This argument is based on the provisions of the federal and state constitutions which prohibit the impairing of contracts. United States Constitution, Article I, Section 10, Arkansas Constitution, Article II, Section 17. The great weight of authority is contrary to appellants' contention, it being recognized that these prohibitions do not prevent a proper exercise by the state of its police power. See 16 C. J. S., § 281, p. 1284. In *Home Building & Loan Assn.* v. *Blaisdell,* 290 U. S. 398, Chief Justice Charles Evans Hughes stated the reasoning with unusual clarity:

"Not only are existing laws read into contracts in order to fix obligations as between the parties, but the

---

[4] The decree of the Chancery Court, after finding that contract "B" was not within the purview of the Act, further provided: "If at any time the contract marked Exhibit "B" or a similar contract is used as a subterfuge to evade Act 78 of 1961, this judgment is not *res adjudicata* and shall not prevent the State of Arkansas from instituting appropriate legal action to insure compliance with the provisions of said Act."

[5] Numerous states, including (but not limited to) Arizona, Idaho, Kansas, Maine, Montana, New York, North Dakota, South Dakota, Texas, Utah, Virginia, and Wisconsin, require all funds to be deposited and held in trust. Many of these states include the interest accruals. Other states require that the greater percentage of the funds be placed in trust; for instance, Georgia, 85%; Iowa, 80%; and Florida, 75%. Illinois requires that 95% of the principal be so deposited, and further provides that only 5% of the interest may be used.

reservation of essential attributes of sovereign power is also read into contracts as a postulate of the legal order. The policy of protecting contracts against impairment presupposes the maintenance of the Government by virtue of which contractual relations are worthwhile—a government which retains adequate authority to secure the peace and good order of society. This principle of harmonizing the constitutional prohibition with the necessary residuum of state power has had progressive recognition in the decisions of this Court.''

Further in the Opinion, quoting from an earlier case:

''It is the settled law of this court that the interdiction of statutes impairing the obligation of contracts does not prevent the State from exercising such powers as are vested in it for the promotion of the common weal, or are necessary for the general good of the public, though contracts previously entered into between individuals may thereby be affected. This power, which in its various ramifications is known as the police power, is an exercise off the sovereign right of the Government to protect the lives, health, morals, comfort and general welfare of the people, and is paramount to any rights under contracts between individuals.''

In *Memorial Gardens Association, Inc.,* v. *Smith, supra,* the Illinois court commented on this particular question as follows:

''Plaintiffs contend that the act constitutes an unwarranted interference with the right of citizens to contract with each other and thus violates constitutional guarantees of both the State and Federal constitutions. While rights of contract are favored and protected there is no principle of absolute freedom of contract. It is a qualified right and the State may, in its legitimate exercise of the police power, pass laws which limit or affect the right of contract so long as those regulations are reasonably necessary to secure the health, safety, morals or general welfare of the community. (citing cases) The constitutional guarantee does not withdraw from legislative supervision that department of human activity

which consists in the making of contracts, or deny to government the power to provide restrictive safeguards. Liberty implies only the absence of arbitrary restraint, not immunity from reasonable regulations and prohibitions imposed on the interests of the community. (citing cases) In the exercise of the police power it becomes necessary to prohibit some forms of contract entirely and to restrict others, yet the right to do so is unquestioned when the public welfare demands it."

In *Reiman* v. *Rawls,* 188 Ark. 983, 68 S. W. 2d 470, this Court, quoting from the *Blaisdell* case, said:

"But into all contracts, whether made between States and individuals, or between individuals only, there enter conditions which arise not out of the literal terms of the contract itself; they are superinduced by the pre-existing and higher authority of the laws of nature, of nations or of the community to which the parties belong; they are always presumed, and must be presumed, to be known and recognized by all, are binding upon all, and need never, therefore, be carried into express stipulation, for this could add nothing to their force. Every contract is made in subordination to them, and must yield to their control, as conditions inherent and paramount, whenever a necessity for their execution shall occur."

Affirmed.

ROBINSON, J., not participating.