397 P.2d 34

Henry A. MESSERLI and Alta B. Messerli, Plaintiffs-Respondents,

v.

MONARCH MEMORY GARDENS, INC., an Idaho corporation, and Lloyd's Advertising Agency, Inc., a Colorado corporation, Defendants-Appellants.

Ellen A. STALEY, a widow, Plaintiff-Respondent,

v.

MONARCH MEMORY GARDENS, INC., an Idaho corporation, and Lloyd's Advertising Agency, Inc., a Colorado corporation, Defendants-Appellants.

Nos. 9447, 9448.

Supreme Court of Idaho.

Nov. 25, 1964.

Graydon W. Smith, Boise, for appellants.

Holden, Holden & Kidwell, Idaho Falls, for respondents.

KNUDSON, Chief Justice.

Appellant Monarch Memory Gardens, Inc., hereinafter referred to as "Monarch", is an Idaho corporation offering for sale to the public vaults, caskets, memorial markers, interment spaces and other incidental burial services. It offers these services and merchandise for sale under two programs, one being based on a present, or "at-need", arrangement under which its services are rendered to anyone requiring immediate burial services. The other program is based on a present purchase of the burial services together with future need, known as "pre-need" services, which is sold on a time-purchase basis. Appellant, Lloyd's Advertising Agency, hereinafter referred to as the "Agency", has an agreement with Monarch under which it handles Monarch's pre-need sales programs.

This appeal involves two "pre-need" contracts entered into separately with respondents, Henry A. Messerli and his wife Alta, on July 14, 1962, and with respondent Ellen A. Staley, a widow, on July 30, 1962. Subsequently both respondents refused to make payments as provided by their respective contracts and commenced separate suits against appellants for rescission of their contracts. Since both actions involved substantially the same issues, they were consolidated for trial and this appeal.

In their respective complaints respondents alleged that the contracts involved are in

violation of I.C. § 54–1117; that the provisions of said contracts constitute the selling of insurance in derogation of the laws of this state; that plaintiffs are not qualified as an insurance company within this state; that the appellant Agency was acting as a real estate broker in violation of law, and that the contracts involved are illegal and void.

In their answer appellants deny each of respondents' allegations and affirmatively contend that the provisions of I.C. §§ 54–1117 through 54–1120 constitute an arbitrary and unreasonable prohibition of appellants' legitimate business and are unconstitutional.

The trial court concluded that the contracts involved are "insurance" and since appellants have not qualified as insurers under the laws of this state, the contracts involved are void and unenforceable. Judgments for respondents were entered October 17, 1963, from which these appeals are taken.

The contracts here involved are prepared upon printed forms with spaces left blank for insertion of names of purchasers, price and other details, together with lines for signature of the parties. The general provisions of said contracts are identical in each case and in order to avoid confusion and repetition we shall, throughout the following discussion, refer to the instruments involved in the Staley case.

Three instruments, only two of which are signed, evidence the over-all contract entered into, which are entitled: (1) Sales Agreement (signed); (2) Family Security Agreement (signed); and (3) Professional Services (unsigned).

A brief resume of the essential provisions of said instruments follows:

Under the "Sales Agreement", which was signed by both parties, the purchaser agrees:

To purchase a casket at a cost of $500; title to remain in Monarch until purchase price is fully paid; casket to be delivered at place specified upon written notice; a $10 down payment is acknowledged and the balance is payable in monthly installments of $14.50 each; in event of default Monarch could terminate the contract and retain up to 25% of the total purchase price as liquidated damages.

The contract also provides that if the purchaser paid $373 of the purchase price within 31 days of the date of purchase and shall die before all payments have been made and if all payments have been made as required, the unpaid balance on the contract and note would be paid from proceeds of credit life insurance purchased by Monarch. This last-mentioned provision being inapplicable if purchaser had reached age 65 prior to purchase and was not in good health.

The agreement could not be assigned by purchaser without the written consent of Monarch; in event purchaser moved to an area more than one hundred miles from Idaho Falls, Idaho, Monarch guarantees to provide a casket or refund 75% of the purchase price, provided written notice is given Monarch within ten days of the death of purchaser.

The "Family Security Agreement", which was also signed by both parties, specified a sale price of $400 with a $48 service charge, $340 of which was evidenced by a negotiable promissory note payable at the rate of $14.50 per month. The contract provides that:

(1) Monarch will convey by deed the right of interment for interment space in semi-developed Garden (cemetery);

(2) Monarch would deposit into the "endowment care trust fund" an amount "as set forth by the Board of Directors heretofore established";

(3) Upon order of the purchaser, his heirs or assigns, Monarch will provide and install a described vault for interment only in the Monarch's Gardens;

(4) Monarch will, upon request of purchaser, his heirs or assigns, install in Monarch's Gardens an individual grave memorial;

(5) In the event of death of an unmarried child of purchaser under 21 years of age, Monarch will provide free of charge interment space for such child;

(6) Monarch will provide the opening and closing of one grave only in its Gardens, such service to include use of Memory Chapel or chapel tent, lowering device, greens, chairs and other equipment as is usually provided by the Company for that purpose;

(7) Monarch agrees to "set aside and place in a trust fund separate and apart from all of its other funds, sufficient money, based upon its present costs and its present wholesale costs with reliable manufacturers, to pay for said merchandise and services when delivered. The amount placed into said fund shall remain intact in said trust fund for the express purpose of paying for the merchandise and services and be subject to the terms of the Trust Agreement, the income therefrom to be used for the best interests of the Company, or its nominees, as the Board of Directors may determine."

(8) "A. Time is of the essence of this Agreement; and should the purchaser default for more than sixty (60) days in any of the installments on the note

**94**

referred to herein the Company may, at its option, declare this Agreement null and void and retain all payments made by the purchaser as liquidated damages, or the Company may, at its option, declare the outstanding balance due and payable upon demand, and the undersigned agree to pay on demand all attorney fees, court costs, and reasonable collection expenses connected thereto. It is further understood that the promissory installment note referred to herein will be negotiated to a third party or parties, and that no defense which may be available against the Company may be asserted against the holder of any such promissory note, and that the holder of any such promissory note shall in no event be liable to the purchaser on account of any undertakings or obligations of the Company".

The instrument entitled "Professional Services" provides in effect that:

"Monarch Mortuary Inc. hereby agrees that upon the payment of $200.00 in cash and presentation of this certificate along with a bill of sale for casket issued by Lloyd's Advertising Agency, Inc., or a casket, to conduct a funeral and provide professional services and facilities dechaser."

Following said paragraph is listed the professional services to be pro-vided which includes cosmetology and hairdressing, duro surgery and technical restorative work; the facilities to be provided include a hearse and first car, use of chapel, reposing room, religious and fraternal paraphernalia, funeral coach, flower car and general assistance in arranging obituaries, news notices, securing legal certificates and permits, and preparation for shipment outside of specified area.

This instrument also provides that, "These agreements will be accepted at any time and these services will be provided as set forth above without the right of cancellation on the part of Monarch Mortuary."

Although respondents allege in their complaints that the contracts here involved are in violation of I.C. § 54–1117, appellants deny such allegations and affirmatively allege that I.C. §§ 54–1117 through 54–1120 are arbitrary, unreasonable, bear no relationship to any pretended need, and amount to an absolute prohibition of the legitimate business of appellants; that they are unconstitutional and void.

Appellants contend that the trial court erred in not deciding the issue raised as to the constitutionality of said statutes. Both parties request that such issue be decided upon this appeal and since a decision of this issue is necessary to the ultimate decision of the issues presented we shall consider it.

The statutes involved provide:

54-1117. "In all cases when, prior to his death, a person or someone in his behalf makes an agreement for the final disposition of his body, under which agreement, pursuant to a pre-arranged funeral plan, personal property or services will be delivered or performed upon his death or the professional services of a funeral director or embalmer will then be furnished, all money paid, directly or indirectly, under such agreement, or under any agreement collateral thereto, shall be held in trust for the purpose for which it was paid until the obligation is fulfilled according to its terms: provided, however, that any payment made pursuant to this section shall be released upon death of the person for whose benefit such payment was made, and no payments so made shall be subject to forfeiture. Accruals of interest upon this money shall be subject to the same trust."

54-1118. "For the purposes of this act, the term 'trustee' shall mean any bank, trust company or savings institution in the state of Idaho insured with the Federal Deposit Insurance Corporation or the Federal Savings and Loan Insurance Corporation; the word, 'depositor' shall mean any person to whom such money has been paid and who is obligated under this act to place the same in trust; the term, 'beneficiary' shall be the person for whom such fund was established."

54-1119. "All funds received as herein provided shall be placed in trust with a trustee pursuant to an agreement executed by the depositor and trustee which shall provide that the trustee shall hold the same in trust for the purposes for which deposited, and that the trustee shall pay the same to the depositor upon the filing of a certified copy of the death certificate or other satisfactory evidence of the death of the beneficiary with the trustee; provided, however, that the said agreement shall further provide that the beneficiary or his duly appointed guardian may, in writing, demand the return of the money, together with accrued interest, if any, less costs incurred in the operation of such trust, and the depositor shall be entitled to receive such money from the trustee for payment to the beneficiary upon delivery of such written demand to the trustee. The payment of such funds and accumulated interest, pursuant to the terms of this act and the agreement herein referred to, shall relieve the trustee of any further liabilities with regard to such funds or interest thereon."

54–1120. "Any person wilfully violating the provisions of this act shall be guilty of a misdemeanor."

Appellants' principal challenge relates to I.C. § 54–1117 and their contention relative to said statute is stated in their answer as follows:

"The statute is unreasonable and arbitrary in that it does not regulate but destroys legitimate businesses by eliminating any funds for operation at the time of sales, and making unenforceable on the part of the business any of its contracts for future performance. As such said statute, and each part thereof, is void, unconstitutional, and unenforceable, in that it amounts to a deprivation of life, liberty or property without due process of law, abridges the privileges and immunities of defendants as citizens, and deprives defendants of equal protection of the law, all in violation of Amendment Fourteen, United States Constitution, and impairs the right to acquire, possess, and protect property, is a deprivation of equal protection of the laws, and is a deprivation of life, liberty or property without due process of law in violation of Secs. 1, 2, and 13, Article 1, Constitution of the State of Idaho."

By said allegations the authority of the legislature to enact said statutes is challenged.

It is universally recognized that the enactment of statutes having for their object the prevention of fraud and deceit is within the police power of the state. 16 C.J.S. Constitutional Law § 187 page 924. A broad discretion is necessarily vested in the legislature to determine not only what the interests of the public welfare required, but what measures are necessary to secure such interests. It must be conceded, and this court has stated, that a regulation abridging or restricting the freedom of contract or regulating the right to engage in any lawful business in a lawful manner must be reasonable and must reasonably tend to accomplish or promote the protection and welfare of the public. Regulations which are arbitrary or capricious and which unreasonably restrict or interfere with the liberities of the citizen, without accomplishing or promoting a legitimate object of the police power, are invalid violations of the fundamental law. Gem State Mutual Life Insurance Ass'n v. O'-Connell, 79 Idaho 427, 320 P.2d 329; State v. Finney, 65 Idaho 630, 150 P.2d 130; Rowe v. City of Pocatello, 70 Idaho 343, 218 P.2d 695. See also Berry v. Koehler, 84 Idaho 170, 369 P.2d 1010.

The concern is not whether the legislative action affects contracts incidentally, or directly or indirectly, but whether the legislation is addressed to a legitimate end and the measures taken are reasonable and appropriate to that end. Home Building &

Loan Asso. v. Blaisdell, 290 U.S. 398, 54 S. Ct. 231, 78 L.Ed. 413. The question presented is whether the statutes challenged are so unreasonable in character, in respect to the matters complained of, as to transcend the proper exercise of the police power.

It is not contemplated by the contracts here involved that delivery be made of such items as a casket, memorial vault, and grave memorial, or interment services rendered such as the "opening and closing of a grave," the "use of the memorial chapel or the chapel tent, lowering device, greens, chairs and other equipment as is usually provided by the company for this purpose," until after the death of the purchaser. The delivery of the property mentioned in the contracts is to be made by Monarch "upon request of the purchaser, his heirs or assigns," provided that such request is made "after receipt of the full sum" contracted to be paid. Under the contracts in question Monarch is not required to make any expenditure until after request for performance and then only after the full purchase price has been paid.

Mr. Lloyd, president and sole owner of Monarch, testified that the company's average contract runs approximately four and one-half to five years before it is paid out. When we consider that the contract payments are to be made within a short period of time as compared to the average lapse of time until performance of the "pre-need"

contracts; that during the long interval between full receipt of the purchase price and contract performance, the possibilities for fraud are great and risk of insolvency, with consequent inability to perform are inherent, it is then that the wisdom of the legislation becomes apparent.

Mr. Lloyd further testified that Monarch was organized April 15, 1962 and on June 10, 1963 it had sold for either cash or on contract 422 adult interment spaces, the sale price of each being not less than $100, and Monarch had placed in trust only the sum of $120.

Appellants have recognized the need of some protection for the purchaser by including in their form of contract certain indefinite provisions relative to setting aside a trust fund. However, these allusory provisions perhaps furnish purchaser appeal, but fail to provide the protection which the legislature deems the situation warrants. In this connection it is worthy of note that appellant Monarch recognizes that abuses and deficiencies in like operations have led to legislative action. In said appellants' instrument entitled "Endowment Care Trust Fund Trust Indenture" (identified and introduced herein as Defendants' Exhibit S), which bears date the 16th day of April, 1962, it is provided:

"WHEREAS, one of the major deficiencies of cemetery operation has

been the failure to provide funds sufficient to insure the adequate maintenance of the cemetery property in perpetuity, which deficiency has been recognized of major importance by a number of states to the extent that they have enacted legislation requiring the establishment of a fund, the income of which must be utilized for the purpose of insuring said maintenance; and

"WHEREAS, Grantor desires to provide for the proper maintenance of the cemetery property even though at the present time the laws of the STATE OF IDAHO contain no provisions securing said proper maintenance * * *".

The main thrust of appellants' argument is that the regulations provided by I.C. § 54-1117 will prevent the operation of its business of "pre-need" sales and that they will be compelled to cease business if required to place in trust all funds received under their contracts. Appellants complain that such regulations deny them the use of the contract funds with which to operate their business. The trust fund provisions of the statute in question are designed to require reserves sufficient to assure the purchasers that the company with which they are dealing will be able to complete their contracts when the time for performance arrives.

The constitutionality of statutes very similar to the one here involved has been considered in a number of cases, among which is Falkner v. Memorial Gardens Association, 298 S.W.2d 934 (Tex.Civ.App. 1957). The statute therein considered applied to any corporation desiring to sell pre-arranged or prepaid funeral services or funeral merchandise (including caskets, grave vaults, and all other articles of merchandise incidental to a funeral service) in that state under a sales contract providing for prepaid burial or funeral benefits or merchandise to be delivered at any undetermined future date depending upon the death of the contracting party. The statute required that

" 'Sec. 5. After the effective date of this Act, all funds collected under contracts for prepaid funeral benefits, including funds collected under contracts made before the effective date of this Act, shall be placed in a state or national bank, or building and loan association in this State and so deposited not less than thirty (30) days after collection, to be held in a trust fund in this State for the use, benefit and protection of purchasers of such contracts. Any withdrawals from such trust fund shall be accompanied by a certified copy of the death certificate, together with proper affidavits as may be required by

the State Banking Department, before such funds shall be released in fulfillment of the contract. In no event shall more funds be withdrawn from the trust account than are originally placed into the fund under any one contract, other than through the payment of accrued interest thereon.' "

The appellees contended that the act was fundamentally unconstitutional because it was confiscatory. In disposing of such contention the court stated:

"Clearly the Act applies alike to all individuals and corporations desiring to sell prearranged or prepaid funeral services or funeral merchandise to be delivered at an undetermined future time dependent upon the death of the contracting party; it is actual classification by the Legislature and it is made to apply to all persons and corporatons in the class. 9 Tex.Jur. p. 555, Sec. 119. The Act does not prohibit the conduct of the business but merely regulates it. This the Legislature has the authority to do. [citations] The fact that the Act requires all funds collected under the contracts to be deposited in a trust fund is a mode of regulation of the business and does not prohibit its conduct. The fact that the Legislature saw fit to impose on the business a regulation that to appellees may seem onerous will not render the Act unconstitutional because the Legislature acting in the public interest was authorized to impose regulations on the business that operate uniformly on all persons engaged in such business. 9 Tex.Jur. p. 490, Sec. 66."

In Memorial Gardens Association, Inc. v. Smith, 16 Ill.2d 116, 156 N.E.2d 587, (1959) the supreme court of Illinois had under consideration a like contention relative to a statute providing that all moneys received under a contract for the purpose of furnishing or performing funeral services, or the furnishing or delivery of any personal property, merchandise or services of any nature in connection with the final disposition of a dead human body, shall be trust funds. In discussing the contention of appellant Memorial Gardens Association, Inc., the court stated:

"Plaintiffs contend that the act constitutes an unwarranted interference with the right of citizens to contract with each other and thus violates constitutional guarantees of both the State and Federal constitutions. While rights of contract are favored and protected there is no principle of absolute freedom of contract. It is a qualified right and the State may, in its legitimate exercise of the police power, pass laws which limit or affect the right of contract so long as those regulations are reasonably necessary to secure the

health, safety, morals or general welfare of the community. City of Chicago v. Chicago & North Western Ry. Co., 4 Ill.2d 307, 317, 122 N.E.2d 553. The constitutional guarantee does not withdraw from legislative supervision that department of human activity which consists in the making of contracts, or deny to government the power to provide restrictive safeguards. Liberty implies only the absence of arbitrary restraint, not immunity from reasonable regulations and prohibitions imposed in the interests of the community. Crowley v. Christensen, 137 U.S. 86, 11 S.Ct. 13, 34 L.Ed. 620; Chicago, Burlington & Quincy R. Co. v. McGuire, 219 U.S. 549, 567, 31 S.Ct. 259, 55 L.Ed. 328. In the exercise of the police power it becomes necessary to prohibit some forms of contract entirely and to restrict others, yet the right to do so is unquestioned when the public welfare demands it. Thus the law may deny the common carrier and the telegraph company the right to make any contract with its patrons exculpating liability for negligence, may prohibit the purchase and sale of lottery tickets, and restrict the right of a minor or an incompetent to contract, except for necessaries. The regulations contained in the present act do not amount to an arbitrary or unwarranted interference with contract rights. The act neither prohibits the right to sell the services or merchandise, nor proscribes advance collections. It does require that such funds, when collected, be set aside for the purpose for which they were intended. The public has a vital interest in securing that result and, insofar as the rights of plaintiffs are affected, those considerations must yield to the paramount public welfare."

In Reserve Vault Corporation v. Jones, 234 Ark. 1011, 356 S.W.2d 225, (1962) the supreme court of Arkansas was presented with the same argument while considering the validity of a like statute requiring that all funds collected under similar contracts shall be held in trust. The court held that such statute does not unconstitutionally impair the contracts of appellant corporation.

Numerous states require that all funds collected under contracts as described in I.C. § 54-1117 be deposited and held in trust. Some include the interest accruals. Other states require that the greater percentage of the funds be placed in trust. We think unquestionably the legislature, by enacting this statute, had in mind the protection of the public and the prevention of fraud. While it is true that the allegations of fraud originally contained in respondents' complaint have been dismissed pursuant to stipulation and on issue of fraud is here presented, such fact has no bearing

on determining the constitutionality of the statute involved. As set out in 16 C.J.S. Constitutional Law § 198, p. 968:

> "*Prevention of fraud.* In determining the constitutionality of a statute bearing on its face clear indication that it was designed to prevent fraud, the court may not give weight to the fact that fraud was neither charged nor proved."

Although a few statutes somewhat comparable but containing distinctive features and different regulatory provisions than the ones here being considered have been declared void, we are satisfied that the great weight of authority, with which we agree, is contrary to appellants' contention and we conclude that the statute here involved (I.C. § 54–1117) is constitutional. The contracts in question do not comply with our statutory requirements and are unenforceable.

From an appraisal of the entire plan as presented by the evidence, the trial court concluded that the contracts involved are "insurance" and since the appellants have not qualified as insurers under applicable statutes of this state, the contracts are void and unenforceable. This finding and conclusion is assigned as error.

Under I.C. § 41–102, insurance is defined as follows:

> " 'Insurance' is a contract whereby one undertakes to indemnify another or pay or allow a specified or ascertainable amount or benefit upon determinable risk contingencies."

Earlier is this opinion we have stated briefly the provisions of the contracts involved. The testimony of the agent who negotiated the sale and the president of the company leaves no doubt but that the three instruments involved in each sale were to be considered and treated as parts of one deal or program. It will be remembered that under these instruments the purchaser became entitled, upon payment in full, to an interment space, casket, grave memorial, complete interment service including professional services and use of special facilities, also interment space for purchaser's deceased unmarried child under 21 years of age.

Clearly the undertaking of Monarch under such contract or program is to sell prearranged or prepaid funeral services or funeral merchandise to be delivered at an undetermined future time dependent upon the death of the contracting party or his child.

In 63 A.L.R. 723, it is stated that "while the authorities are not agreed as to whether or not a contract for payment of burial expenses is in the nature of an insurance contract, the majority of the cases answer this question in the affirmative, and regard the contract as one of insurance." See also 100 A.L.R. 1453; 119 A.L.R. 1243.

Appellants argue that since there is the element of a fixed price and the fact that the merchandise and services must be delivered upon demand, and not necessarily upon the death, of the purchasers, the contract is not one of insurance. A like contention was considered in State v. Smith Funeral Service, 177 Tenn. 41, 145 S.W.2d 1021 (1940), in which case the defendant issued two classes of certificates which in substance stated that in consideration of an installment payment in a specified sum, followed by weekly payments of fixed sums, defendant agreed to allow an 80% discount from the regular selling price of a casket and clothing purchased from defendant by anyone designated as their agent and related to the certificate holder. It also provided that defendant would embalm the certificate holders and furnish hearse service at the prevailing price and they agreed to handle all details incident to the funeral promptly. It also contained the admonition that "at the time of death of the within named certificate holder notify Smith Funeral Service, Inc. at once." Defendants herein argued that the certificates were not insurance contracts since the certificate holder or his representative could call upon the defendants to furnish the casket and burial clothing at any time while the certificate was in force, and the death of the holder was not required to mature the obligation of defendants. In considering such contention the court stated:

"We are of opinion that in their practical operation the certificates issued by the defendant will impose no liability upon the defendant until the death of the certificate holders. This, for the reasons above indicated.

"We are further of opinion that the defendant never contemplated in the issuance of these contracts that they would be matured until the certificate holders died. Otherwise, why the admonition on each certificate 'at the time of death of the within named certificate holder notify Smith Funeral Service, Inc., at once.'

"The undertaking in these contracts to embalm the certificate holders and furnish hearse service at the prevailing price, and the obligation to handle all details incident to the funeral promptly, very plainly show that the defendant was contracting with reference to death.

"It seems to us that the apparent right given to a certificate holder of defendant to demand his coffin and grave clothes prior to his death is a right of such improbable exercise that it does not alter what we regard the real nature of the contract. The effect on the course of business will be negligible. The business in reality will continue that of burial insurance."

There is some language in the contracts involved which could be considered as providing some plausibility to appellants' contention. However it must be conceded that the nature of a business being pursued is not determined by the things that may possibly be done in that business or by things that may have been done. It is determined rather by the usual course of the particular business. In Jordan v. Group Health Ass'n, 71 App.D.C. 38, 107 F.2d 239 (1939), where a like question was being considered, the court said:

"That an incidental element of risk distribution or assumption may be present should not outweigh all other factors. If attention is focused only on that feature, the line between insurance or indemnity and other types of legal arrangement and economic function becomes faint, if not extinct. This is especially true when the contract is for the sale of goods or services on contingency. But obviously it was not the purpose of the insurance statutes to regulate all arrangements for assumption or distribution of risk. That view would cause them to engulf practically all contracts, particularly conditional sales and contingent service agreements. The fallacy is in looking only at the risk element, to the exclusion of all others present or their subordination to it. The question turns, not on whether risk is involved or assumed, but on whether that or something else to which it is related in the particular plan is its principal object and purpose."

" * * * As we have said, it is the plan as a whole, not artificially disjointed and segregated single phases of it, with which we are concerned. * *"

The appellants have not, insofar as the pleadings or evidence disclose, engaged in the general undertaking business nor have they engaged in the manufacture or sale of general burial supplies, or acquired any of the facilities therefor. The record shows that the furnishing of caskets, memorials, and the use of funeral facilities, etc., by appellants to their customers during their lives is not in keeping with appellants' usual course of business. In this connection the following is an excerpt from the testimony of the person who sold respondents their contracts:

"Q   And a request ordinarily would be at the time of death?

"A   Now, if they had wanted that casket delivered the day after they signed their contract, we could have delivered it to their home.

"Q   After they signed the contract?
"A   If they wanted it, yes, uh huh.
"Q   Did you ever have that done?
"A   No. They didn't ask.

"Q Did you ever have any of the memorials delivered?

"A No. They was never asked for.

"Q Did you ever have a request for any of the vaults to be delivered?

"A No. They never asked for it.

"Q Have you ever had that done?

"A No.

\* \* \* \* \* \*

"Q You have never had a request for a delivery, then, I take it?

"A No.

"Q And you didn't intend that they would be delivered?

"A I sure didn't."

A very similar set of facts was considered by the supreme court of Washington in State ex rel. Fishback v. Globe Casket & Undertaking Co., 82 Wash. 124, 143 P. 878, (1914) and one of the principal issues presented was whether the defendant company was engaged in an insurance business. Its business was confined to the sale of two forms of certificates and the performance, through the agency of others, of the obligations assumed thereby.

Under one certificate the company agrees, on the death of the holder, "to take charge of the burial of said holder, and provide the necessary furnishing and materials therefor to the value of one hundred ($100) Dollars, as follows: \* \* \*" (then is listed a casket, an outside box, hearse, carriages, burial robe, embalming, accessories and funeral director). The other certificate is similar in form with the exception that it does not name the value of the furnishing. Sales of the certificates were made on the installment plan. In discussing the contention that the company is not engaged in an insurance business, the court stated:

"\* \* \* we think the business is clearly insurance. The contract evidenced by the certificate has all of the elements of a life insurance contract. It is an agreement to perform a service which can become obligatory only on the death of the certificate holder. While no beneficiary of the promise is named, in reality one exists, and may be ascertained with as much certainty as if directly and specifically named. It is the person who would otherwise be obligated to pay the expenses of the burial. This may be the heir of estate of the decedent, his relatives, or the state; but, whoever such person may be, he is relieved of his obligation to the extent of the value of the service agreed to be performed by the terms of the certificate. There is therefore a promise by one person to perform a valuable service on the death of another, a valuable consideration paid for the promise, and a person to whom the benefit of the promise will inure. Had the ordinary insurance nomenclature been used to designate the person making the promise, the person to whom

the promise is made, the person who will receive the benefit of the promise, and the consideration paid for the promise, no one would question that it was an insurance contract. But a contract is to be determined from its nature and effect, not by the terminology used to characterize it. Here there is an 'insurer,' and 'insured,' a 'premium,' and a 'beneficiary,' and we think the contract nothing else than a plain, ordinary insurance contract."

In Memorial Gardens Association, Inc. v. Smith, supra, wherein similar contracts were being considered, the court stated:

"The contracts here involved are analogous to a form of insurance. By payments made during life, the purchasers seek to insure their burial. The net effect is the same as though a life insurance contract were purchased to provide a sufficient sum payable at death to accomplish that result."

The foregoing language was quoted with approval in Reserve Vault Corporation v. Jones, supra.

Whether there are sufficient elements in a contract such as risk or benefits contingent upon death, to render the entire contract one of insurance depends on the facts of a particular case. In the present case Monarch assumes the risk under the "Sale Agreement" that if the purchasers shall have paid $373 within 31 days of the purchase and shall die before the remaining payments (aggregating $500) have been made, Monarch would be obligated to furnish the described casket regardless of its actual cost. In fact it purchased credit life insurance to guard against this risk. Under the "Professional Services" certificate Monarch assumes the risk of being required to pay substantially more than $200 for the services and facilities therein specified to be furnished for the final rites of the purchaser. Under the "Family Security Agreement" it assumes the risk of furnishing, free of charge to purchaser, interment space for a deceased child of purchaser who at the time of death was unmarried and under 21 years of age. (In the Staley case purchaser was permitted to list four grandchildren as being covered by such provision.)

Our conclusion is that the instruments entitled "Family Security Agreement" and "Professional Services" are insurance contracts and when all three of the instruments here involved are considered together as embodying and constituting the contract between the parties, such contract is insurance.

Failure of the trial court to determine if the instruments here involved provide for the sale and transfer of such title to, or interest in real property as requires appellant agency to be licensed as a real estate broker is assigned as error. Obviously the

trial court did not consider such question to be a vital issue in the case and being of the same view we shall not consider it. The judgment of the trial court is affirmed. Costs to respondents.

McQUADE, J., concurs.

McFADDEN, Justice (concurring in part and dissenting in part).

I concur in the majority opinion insofar as it holds that the contracts in question are governed by the provisions of I.C. § 54–1117 through § 54–1120, and that such sections of the statute are constitutional. I dissent, however, from that portion of the opinion which holds that the contracts in question constitute an insurance contract.

■ It is my conclusion that basically the contracts involved here are contracts providing for the purchase of services and merchandise, with delivery postponed until after death. It is recognized that under one of the contracts, even though less than the full amount of the contract has been paid at the time of death, if $373.00 has been paid within 31 days of signature of the contract, the balance remaining will be paid in full. In this instance, however, it must be emphasized that this additional payment comes, not by reason of the provisions of the contract itself, but by reason of an insurance policy being made a part of the contract. This insurance policy is issued by a regularly licensed insurance company with payments being made to the appellant. Another feature that has been considered is a supplemental provision to the "Family Security Agreement" which obligates the appellant to provide interment space free of charge in the event of the death of any of respondent's unmarried children under the age of 21 years. This provision is the only obligation of appellant under the contracts wherein the appellant will not be fully compensated for the merchandise to be delivered and the services to be performed, and its importance is of such a relatively minor nature that this feature alone should not be the governing determination of the contracts as a whole.

The majority opinion in reaching the conclusion that such arrangement constitutes a contract for insurance refers to the following cases: State v. Smith Funeral Service (1940), 177 Tenn. 41, 145 S.W.2d 1021; Jordan v. Group Health Ass'n (1939), 71 App.D.C. 38, 107 F.2d 239; State ex rel. Fishback v. Globe Casket & Undertaking Co. (1914), 82 Wash. 124, 143 P. 878; Memorial Gardens Association, Inc. v. Smith (1959), 16 Ill.2d 116, 156 N.E.2d 587; Reserve Vault Corporation v. Jones (1962), 234 Ark. 1011, 356 S.W.2d 225. In addition reference is made to the annotations appearing at 63 A.L.R. 711, 100 A.L.R. 1449–1453, 119 A.L.R. 1241–1243.

In State v. Smith Funeral Service, supra, the Tennessee case decided in 1941, the

Supreme Court of Tennessee, relied upon its prior decision of State ex rel. District Attorney General v. Mutual Mortuary Ass'n (1933), 166 Tenn. 260, 61 S.W.2d 664, and also upon the provisions of its statute § 6085, which provides:

"A contract of insurance is an agreement by which one party, for a consideration, promises to pay money or its equivalent, or to do some act of value to the assured, upon the destruction or injury, loss or damage of something in which the other party has an insurable interest."

The court stated:

"The liability of an insurer is contingent. The contingency under our statutory definition is 'the destruction or injury, loss or damage of something.' Loss of life of the insured, of course, is the contingency in life insurance."

In State ex rel. District Attorney General v. Mutual Mortuary Ass'n, supra, the question before the court concerned the nature of the business which the association conducted. There a member was issued a certificate under the terms of the payment of a fee and a promise to pay future assessments when levied. The certificate issued by the association entitled a member to receive a burial, including services and casket, although he had paid only one assessment. The court stated: "A member is entitled to such burial if he has only paid one assessment. Such member may be possessed of no estate, but, if he pays his assessments, he is insured a decent burial. This insurance is issued upon the life of the member and is payable at his death." The court held that such association was engaged in the life insurance business.

In the case of State v. Smith Funeral Service, supra, the form of the certificate involved is not discussed in detail, nor is the consideration to be paid outlined clearly. It is pointed out, however, that:

"The substance of these certificates is an obligation on the part of defendant for the consideration stated [in consideration of an installment payment in a named sum, followed by weekly payments of named sums] to furnish its customer's representative with a casket and grave clothes for the customer's burial at twenty per cent (or other per cent) of the regular retail selling price of such articles. Instead of paying to the certificate holder's representative a sum of money to be applied in payment of funeral expenses, the defendant in substance assumes the greater portion of the expense of the funeral. Save in one respect, hereafter to be noted [that purchaser may call upon defendant to furnish the casket and clothing at any time], the contracts issued by the defendant do not materially differ from

those considered in State ex rel. [District Attorney General] v. Mutual Mortuary Association, Inc., 166 Tenn. 260, 61 S.W.2d 664. The contracts considered in that case were held to be insurance contracts and the association issuing them was held to be doing an insurance business * * *".

Again reiterating that in State v. Mutual Mortuary Ass'n, the rationale of the decision was that a member of the association was entitled to burial if he had paid only one assessment, the same provision must have been incorporated into the agreements before the court in State v. Smith Funeral Service, supra. In the instant case before this court, there is no obligation on the *part of appellant until such time as the contracts have been paid in full.*

The case of Jordan v. Group Health Ass'n (1939) 71 App.D.C. 38, 107 F.2d 239, has been quoted in the majority opinion. That case involved the question of whether a group health association was engaged in the insurance business contrary to the applicable provisions of the insurance code of the District of Columbia. The quotation in the majority opinion dealt solely with a determination of whether the association was one exempt under the provisions of the applicable statute. The ultimate holding of the court was to the effect that the particular association was one exempt under the applicable laws. It is interesting to note that as authority for the statement quoted from Jordan v. Group Health Ass'n, supra, the following appears.

"Care must be taken to distinguish mere contracts to render service on the happening of a contingency from true contracts of insurance. * * * The cases have failed to declare a satisfactory rule for distinguishing between the two types of agreements, but it would seem that the contract should not be classed as insurance if the paramount purpose in its formation was to be the rendition of the services rendered. * * * (1936) 3 U. of Pittsburg L.Rev. 250, 251–252 and notes 7–12; (1939) 52 Harv.L.Rev. 809, 814, n. 37."

In State ex rel. Fishback v. Globe Casket & Undertaking Co., (1914) 82 Wash. 124, 143 P. 878, the issue before the court was whether the appellant should be enjoined from conducting its business and have its corporate affairs wound up and its charter forfeited. The company had been organized under the laws of Washington with its purposes outlined in its charter. It had a 50 year existence, and engaged in selling of certificates to provide for burial services. From the opinion it appears that upon the first installment payment being made after the purchaser's application was approved, the appellant was bound to furnish the services in full. When the installments are

fully paid, a certificate incorporating all the agreements is issued. The cost of the certificate is not shown. The court in determining that the company was engaged in an insurance business, held that the contracts had all the elements of a life insurance contract. Further the court pointed out that the contract is not one the courts will strain to uphold. " * * * It is freighted with the greatest possibilities for fraud. * * * Its duration is limited to 50 years. * * * It is certain that many of these certificates will not be ripe for redemption for a number of years, and it is reasonably certain that some of them will survive the life of the corporation itself. If, therefore, the company were permitted to continue the business, and all or any considerable proportion of these certificates were ever redeemed, it will be a consummation unique in human experience."

In Memorial Gardens Association, Inc. v. Smith (1959), 16 Ill.2d 116, 156 N.E.2d 587, the question before the Supreme Court of Illinois was not a question of whether pre-need burial contracts were a form of insurance, but simply whether such contracts were within the purview of a legislative enactment entitled "An Act concerning agreements for furnishing or delivery of personal property, merchandise or services in connection with the final disposition of dead human bodies and regulating use or disposition of funds paid on said agreements and providing penalties for violation thereof." In the body of the opinion, by way of analogy, the Court discussed the nature of the contracts as being analogous to a form of insurance. But that Court did not hold such contracts to be insurance contracts and the statements quoted in the majority opinion from that case, in my opinion, are merely dicta used as an analogy in determining that contracts were within the provisions of the adopted act. The decision was not a determination that such contracts were a form of insurance. Indeed, the Court itself stated "There is no performance by the company until full payment is made under the contract."

In Reserve Vault Corporation v. Jones, (1962) 234 Ark. 1011, 356 S.W.2d 225, the Supreme Court of Arkansas quoted at length from the Illinois case of Memorial Gardens Association, Inc., v. Smith, supra, in holding that the legislative act in question was constitutional. Again the question of whether the contracts involved constituted insurance was not in issue.

It is my conclusion that the authorities, relied upon by the majority opinion in determining that these contracts are a form of insurance, are not applicable to the case at bar. In the instant action there is no performance required of appellant until such time as the contracts have been paid in full by the purchaser. There is no question but what there is a final, fixed, and completed

price to be paid. It is my further conclusion that the reasoning of the Supreme Court of Georgia in the case of South Georgia Funeral Homes v. Harrison (1936), 183 Ga. 379, 188 S.E. 529, is correct. In that case the Supreme Court of Georgia held that a contract wherein a corporation, for a fixed sum paid in cash, or in installments, agreed to render funeral services to a purchaser or a member of his family and to allow the purchaser to buy funeral merchandise for definite price, did not constitute a life insurance contract, notwithstanding that performance was contingent on death and the consideration was payable in installments. In coming to that conclusion the court stated:

"* * * It will thus be seen that no definite line of demarcation can be arbitrarily drawn, but each contract must be construed unto itself, together with evidence dehors the contract itself, in order to ascertain whether the particular contract under consideration is one of life insurance or otherwise. We think it can safely be said, however, that a contract of life insurance must contain an element of risk in so far as the particular individual contract is concerned. The contract now being sold by the defendants, and by reason of the sale of which this contempt proceeding arose, is one wherein the defendant corporation, for a fixed and

definite sum in hand paid or payable in installments, agrees to render and perform or cause to be rendered and performed, for the purchaser or any one member of his family, certain funeral services, with the additional obligation to allow the purchaser to buy funeral merchandise in connection with the funeral, for a price definite and ascertainable. While the performance of the contract is contingent upon death, this in and of itself does not make it a contract of life insurance, nor does the fact that the fixed sum is payable in installments. There is nothing in the contract itself nor is there any evidence to show that the amount paid by a purchaser is less than the value of the funeral services contracted to be performed, or that there is any element of risk involved, either on the part of the purchaser or the defendant corporation. The contract on its face does not appear to be one of life insurance. * *"

It is my conclusion that these are not contracts "* * * to indemnify another or pay * * * a specified or ascertainable amount or benefit upon determinable risk contingencies," as insurance is defined by I.C. § 41–102, but are in the nature of installment contracts for purchase of merchandise and services. It is my further conclusion that the trial court erred in determining this to be a form of insurance.

The cause should not be reversed, however, for this form of contract is within the purview of I.C. §§ 54–1117 to 54–1120, which is a constitutionally enacted law.

TAYLOR and SMITH, JJ., concur.