No. 44,237

STATE OF KANSAS, ex rel. ROBERT C. LONDERHOLM (Substituted for William M. Ferguson), Attorney General, ROBERT PENNINGTON, Neosho County Attorney, and FRANK L. SULLIVAN, Commissioner of Insurance, *Appellant* and *Cross-Appellee*, v. NORMAN ANDERSON, Individually and d/b/a Ten [10] Named Corporations, et al., *Appellees* and *Cross-Appellants*.

(408 P. 2d 864)

Opinion filed December 11, 1965.

*Park McGee*, assistant attorney general, argued the cause, and *Robert C. Londerholm*, attorney general, *Robert E. Hoffman*, assistant attorney general, and *Robert Pennington*, county attorney, were with him on the brief for the appellant and cross-appellee.

*George B. Powers*, of Wichita, argued the cause, and *Carl T. Smith, John F. Eberhardt, Stuart R. Carter, Robert C. Foulston, Malcolm Miller, Robert N. Partridge, Robert M. Siefkin, Richard C. Harris, Gerald Sawatzky, Donald L. Cordes, Robert L. Howard, Charles L. Woodin, Mikel L. Stout, Ronald K. Badger,* and *Benjamin C. Langel,* all of Wichita, and *Joe F. Balch,* of Chanute, were with him on the brief for the appellees and cross-appellants.

The opinion of the court was delivered by

HARMAN, C.: This action was initiated to test the propriety of certain practices of defendants in selling cemetery lots and burial equipment on a pre-need basis at various cities in Kansas, and to compel compliance with certain statutes.

Norman Anderson, a Texas resident, owns all the stock in Sacred Gardens, Incorporated, a Texas corporation, and substantially all the stock in nine Kansas corporations, all being defendants herein, and appellees and cross-appellants. He or the Texas corporation purchases land near a city and then sells a part of it to the particular Kansas corporation and a cemetery is laid out. Then pursuant to

contract with the local corporation, trained sales personnel of the Texas corporation canvass the community selling cemetery lots on a pre-need basis. Approximately ninety percent of these sales are on an installment plan basis with payments extending for as much as seventy-two months and approximately ninety percent also include the sale of a burial vault and memorial marker. More detailed mention of the practices used will be made in discussing the points involved in this appeal, which for clarity will be classified under the separate headings of A. *Lots;* B. *Burial vaults and markers;* and C. *Insurance.* The parties will be referred to simply as plaintiff and defendants.

A. *Lots.* Three separate but closely related points are involved here upon appeal and cross-appeal.

1. The installment contracts provided that the defendant cemeteries would deposit into an endowment trust fund a sum equal to twenty percent of the contract price for lots for permanent maintenance of the cemeteries. The defendants established such a fund but their practice was to pay in the twenty percent only after the full amount of the contract price had been paid. The initial action was designed to compel defendants to pay in the full twenty percent upon execution of the contract. The trial court held that defendants' obligation as to the required percentage to be paid into a permanent maintenance fund insofar as state regulation required it is fulfilled by their compliance with our statute pertinent to cemetery corporations (K. S. A. 17-1311) which provides:

"That such corporation shall fix and set aside, within the state of Kansas, a percentage of the purchase price of each burial lot sold by it, not less than ten percent (10%) thereof, for the permanent maintenance of the said cemetery, which sum so as aforesaid set aside shall be by said corporation invested in first mortgages upon Kansas real estate, or in bonds issued by any municipality of the state of Kansas, or in obligations of the United States government, except railroad-aid bonds, and the proceeds of the said permanent maintenance fund shall be used exclusively for the maintenance of said cemetery: *Provided, however,* No part of the principal of said fund shall ever be used for any purpose except for such investment. . . ."

Plaintiff's challenge to this ruling is based upon the theory that a charitable trust is involved which the state has an interest in upholding. It is true that as to certain charities of a character so public as to interest the whole community the attorney general of the state has duties to uphold and enforce (see *Troutman v. DeBoissiere,* 66 Kan. 1, 71 Pac. 286). So also the public is interested

in the maintenance of cemeteries including those operated for profit as are defendants. We believe, insofar as applicable to the point at issue, the extent of that interest is that expressed by the legislature in the statute, K. S. A. 17-1311. When the legislature has clearly spoken defining the policy of the state in a given area there is no place for judicial definition. In *Reser v. Southern Kansas Mutual Ins. Co.*, 150 Kan. 58, 91 P. 2d 25, this court quoted from *United States v. Freight Association*, 166 U. S. 290, 340, 41 L. ed. 1007, 17 S. Ct. 540, as follows:

"'. . . when the lawmaking power speaks upon a particular subject, over which it has constitutional power to legislate, public policy in such a case is what the statute enacts.'" (p. 64.)

We hold the trial court correctly ruled that ten percent was the proper percentage figure to be enforced in this action. It must be emphasized the result reached is in no wise to be construed as affecting private contractual rights and obligations of the parties to the particular contracts or that they would not be enforced in an appropriate proceeding.

2. The trial court ruled that defendants were required to pay ten percent of each installment payment into the statutory permanent maintenance fund at the time each of said installments was received. By way of cross-appeal defendants challenge this ruling, claiming that K. S. A. 17-1311 does not require any payments to be made into the permanent maintenance fund until the full purchase price of the lots is paid and the sale completed. They point to the contract provisions that a deed to the lots is not to be delivered until after full payment, ergo, there is no sale until full payment is made, and no maintenance payment is required until the lots are sold. The statute, originally enacted in 1901 (Laws 1901, ch. 102, § 5), expressed the public concern in maintaining in a seemly manner places set apart as burial grounds and in preventing the maintenance of privately developed public cemeteries from becoming public charges. Being of a remedial nature it is to be liberally construed to effectuate the purpose for which it was enacted (*Van Doren v. Etchen*, 112 Kan. 380, 383, 211 Pac. 144). We think the narrow construction of the statute urged by defendants would tend to defeat that purpose. It must be remembered defendants operate as a business venture, for profit, and there are many possibilities whereby money received from the sale of lots might be diverted without adequate provision for maintenance and care

of the cemeteries, which is exactly what the statute seeks to prevent.

We are unwilling to place such meticulous or technical definition on the words "purchase price" and "sold" as used in the statute as would defeat its manifest intention. For the practical purposes of the statute a lot is "sold" and part of the "purchase price" is required to be set aside when the terms of purchase are agreed upon and purchase money is received pursuant thereto.

We construe the statute to mean, as did the trial court, that when money is received in installments by defendants pursuant to installment contract for the sale of lots—whether a deed is delivered or not and whether the sale is to be deemed technically completed or not—at least ten percent of such installment payment shall be set aside for the permanent maintenance fund.

3. Plaintiff contends the court erred in holding that the percentage required to be deposited by the defendants in the perpetual maintenance fund should be figured on only one purchase price, even though a lot might be sold more than once in case the original purchaser defaulted on his installment payments. We are cited to no authority for this contention and we are aware of no compelling reason why the statute in question should be so extended in order to effectuate its purpose. We think the statute contemplates no more than a single purchase price, as the trial court ruled.

B. *Burial vaults and markers.*

1. Plaintiff asserts that defendants failed to comply with applicable statutes governing funeral agreements, contracts and plans, being K. S. A. 16-301, 16-302, 16-303, and 16-304, which provide:

"16-301. Any agreement, contract or plan requiring the payment of money in a lump sum or installments which is made or entered into with any person, association, partnership, firm or corporation for the final disposition of a dead human body, or for funeral or burial services, or for the furnishing of personal property or funeral or burial merchandise, wherein the delivery of the personal property or the funeral or burial merchandise or the furnishing of professional services by a funeral director or embalmer is not immediately required, is hereby declared to be against public policy and void, unless all money paid thereunder shall be paid to and held by a bank or trust company which is authorized to do business in this state, and subject to the terms of an agreement for the benefit of the purchaser of said agreement, contract or plan.

"16-302. All such money shall be deposited with such bank or trust company and shall be held by such bank or trust company in a separate account in the name of the purchaser of said merchandise or services under said agreement, contract, or plan, until said fund is released as herein provided.

"16-303. All payments made under said agreement, contract or plan and any earnings or interest thereon shall be and remain funds with such bank or

trust company until the death of the person for whose service the funds were paid: *Provided, however,* Said funds shall be released to the purchaser of the merchandise or services under said agreement, contract or plan who shall be entitled to receive the same, or any part thereof, at any time upon demand upon said bank or trust company.

"16-304. If any balance remains in said account upon the death of the person for whose services the funds were paid, the same shall not be paid by such bank or trust company to the person, association, partnership, firm or corporation until the expiration of at least 5 days after the date of death of the person for whose services such funds were paid. Said funds shall not be paid by said bank or trust company until a certified copy of the death certificate of such person shall have been furnished to said bank or trust company, together with a verified statement setting forth that all of the terms and conditions of such agreement have been fully performed by said person, association, partnership, firm or corporation. Any balance remaining in said fund after payment for the merchandise and services as set forth in said agreement, contract or plan shall inure to the benefit of the estate of the purchaser of said agreement, contract or plan."

Defendants admit non-compliance but say these statutes do not apply to their operations and also that these provisions are unconstitutional. Inasmuch as the trial court sustained the latter contention it will be dealt with first. Defendants contend generally that the act constitutes an unwarranted exercise of police power, that it is confiscatory and not regulatory, impairs the right to contract and thereby violates the due process clauses of state and federal constitutions.

Defendants cite and rely on the case of *Gilbert v. Mathews,* 186 Kan. 672, 352 P. 2d 58, in which the "New Goods Public Auction Law" (Laws 1955, ch. 172) was held to be unconstitutional. In that case the court discussed the extent of the police power, saying:

"This court has repeatedly held that the police power of the state extends not only to the protection of the public health, safety and morals, but also to the preservation and promotion of the public welfare. (*State v. Consumers Warehouse Market,* 183 Kan. 502, 329 P. 2d 638, and cases cited therein.)

.   .   .   .   .   .   .   .   .   .   .   .   .   .

"While the police power is wide in its scope and gives the legislature broad power to enact laws to promote the health, morals, security and welfare of the people, and further, that a large discretion is vested in it to determine for itself what is deleterious to health, morals or is inimical to public welfare, it cannot under the guise of the police power enact unequal, unreasonable and oppressive legislation or that which is in violation of the fundamental law. (*Little v. Smith,* 124 Kan. 237, 257 Pac. 959.)

"When once a subject is found to be within the scope of the state's police power the only limitations upon the exercise of the power are that

regulations must have reference in fact to the welfare of society and must be fairly designed to protect the public against the evils which might otherwise occur. Within these limits the legislature is the sole judge of the nature and extent of the measures necessary to accomplish its purpose." (pp. 676-678.)

We have no difficulty in saying the subject is within the scope of the state's police power. The state has long had regulatory statutes of various kinds touching upon disposition of dead bodies. That mentioned in A. herein, pertaining to the permanent maintenance of cemeteries, is one example. K. S. A. 65-1701, providing for licensing and regulation of embalmers and funeral directors, is another. Moreover, the contracts in question are admittedly sold on a promotion campaign basis. Many are sold to those of a comparatively young age. For example, the two contracts shown in the record are with married couples in their twenties and thirties. Delivery of the merchandise, according to the contracts, is to be made "upon the request of the Purchaser, his heirs or assigns" and then only "after receipt of the full contract price." Certainly it cannot be contemplated as to the burial vault that delivery will be requested until after the death of the purchaser. This means then a great time lag between the time of bargaining and performance, and, as stated in A. 2 above, there is a public interest in the protection of funds intended for a particular purpose, from whatever hazard, whether the normal vicissitudes of business or plain fraud and deceit. There is nothing unusual about requiring one contracting for future performance to give some guarantee for that performance. Defendants recognize the need of some such protection for the purchaser by including in the contract a provision that they will set up what they term a *merchandise trust* wherein they agree they will, upon full payment of the contract price, set aside in a trust fund an amount of money based upon present wholesale cost of the merchandise plus ten percent, such sum to be for the construction and installation thereof. In the annotation in 68 A. L. R. 2d at page 1251 touching upon the subject of state regulation it was concluded:

"Pre-need burial insurance contracts have become quite common in this country, and since they present opportunities for fraud and frequently cater to people most easily duped by fraudulent schemes, many states have attempted regulation of such contracts."

The enactment of statutes for the prevention of fraud and deceit is within the police power of the state (16 C. J. S., Constitutional Law, § 187, p. 924).

The whole enterprise presents a fertile field for fraud and imposition and is properly subject to the police power of the state.

Next is the question as to whether the particular enactment was a lawful and constitutional exercise of that power. Defendants argue that requiring one hundred percent of all money received for the sale of burial merchandise to be placed in a trust fund is obviously prohibitory. The complaint could be viewed simply as a criticism of the statute. As such it should be addressed to the legislature. Matters relating to the policy, wisdom or expediency of particular regulations under the police power are for legislative rather than judicial determination (see *State, ex rel., v. Sage Stores Co.,* 157 Kan. 404, 141 P. 2d 655, affirmed in 323 U. S. 32, 89 L. ed. 25, 65 S. Ct. 9). The record does indicate the local cemetery corporations pay the parent corporation thirty-five percent of the contract price for selling costs. The requirement of the statute might in effect tend to limit a type of business practice wherein large promotion costs incurred in blanketing an area become necessary but it certainly does not prohibit sales, even upon a pre-need basis. Moreover, the fact that certain prohibitions may result does not in and of itself render a statute unconstitutional. In *State ex rel., v. Sage Stores,* supra, we find this quoted with approval:

"'Whether the purposes of the statute may be attained by regulation or whether absolute prohibition is necessary are questions for the legislature.'" (p. 414.)

The whole enterprise described is of such nature as to invite stringent regulation. In *Memorial Gardens Ass'n. v. Smith,* 16 Ill. 2d 116, 156 N. E. 2d 587, in which the constitutionality of a similar statute was upheld against the same contentions made here, the court said:

"In the long interval between full receipt of the purchase price and contract performance, the opportunities for fraud are great and risk of insolvency, with consequent inability to perform, apparent. The suggestion that actual costs are a minor item and that the legislature should have required a smaller deposit is unimpressive under the circumstances. The main thrust of plaintiffs' argument is that the regulations of the act will prevent the operation of its business of 'pre-need' sales and that they will be compelled to cease business if forced to make sales only at the time of death. However, the act neither restricts plaintiffs' sales of such property at the time of death, nor prohibits 'pre-need' sales. . . .

"We do not believe that the present statute operates to prohibit plaintiffs' legitimate business. It does regulate the manner in which the business may be

conducted. Practically, plaintiffs will no longer be able to collect prospective profits in advance, without furnishing an adequate guarantee for performance. However, this does not prohibit the operation of this type of business. A large discretion is necessarily vested in the legislature to determine not only what the interests of the public welfare require, but what measures are necessary to secure such interests. . . . Plaintiffs' argument amounts to an admission that they will be unable to compete with others who sell the same merchandise and services at the time of actual need. However, the public welfare need not be abrogated to enable an individual to carry on his business in the particular manner in which he has elected to proceed. The analogy which plaintiffs seek to draw between their contracts and retail sales made on the 'lay away' plan is fallacious. The 'lay away' sale contemplates performance within a relatively short period of time upon payment of the purchase price. Opportunities for fraud are negligible and remedies for nonperformance are readily available.

"Plaintiffs contend that the act constitutes an unwarranted interference with the right of citizens to contract with each other and thus violates constitutional guarantees of both the State and Federal constitutions. While rights of contract are favored and protected there is no principle of absolute freedom of contract. It is a qualified right and the State may, in its legitimate exercise of the police power, pass laws which limit or affect the right of contract so long as those regulations are reasonably necessary to secure the health, safety, morals or general welfare of the community. . . . The constitutional guarantee does not withdraw from legislative supervision that department of human activity which consists in the making of contracts, or deny to government the power to provide restrictive safeguards. Liberty implies only the absence of arbitrary restraint, not immunity from reasonable regulations and prohibitions imposed in the interests of the community. . . . In the exercise of the police power it becomes necessary to prohibit some forms of contract entirely and to restrict others, yet the right to do so is unquestioned when the public welfare demands it. Thus the law may deny the common carrier and the telegraph company the right to make any contract with its patrons exculpating liability for negligence, may prohibit the purchase and sale of lottery tickets, and restrict the right of a minor or an incompetent to contract, except for necessaries. The regulations contained in the present act do not amount to an arbitrary or unwarranted interference with contract rights. The act neither prohibits the right to sell the services or merchandise, nor prescribes advance collections. It does require that such funds, when collected, be set aside for the purpose for which they were intended. The public has a vital interest in securing that result and, insofar as the rights of plaintiffs are affected, those considerations must yield to the paramount public welfare." (pp. 126-129.)

Defendants claim they will not be able to operate if they are deprived of all the funds pursuant to the statute. Be that as it may, we agree with a statement quoted in the above-cited Memorial Gardens Association case wherein it is said:

". . . it would be most unusual to expect or require prospective pur-

chasers to 'furnish or advance capital funds necessary for the operation of a business.'" (p. 126.)

It may again be pointed out that under their contracts, aside from the so-called merchandise trust which is under their control, defendants are not required to make any expenditure for merchandise until after request and after full payment. The particular merchandise need not be held by defendants at the time of the making of the contracts, or even to be in existence. We would not deprecate promotion or sales costs in the operation of a business but these are not ordinarily permitted to become so burdensome as to put one out of business if advance profits be not drawn. That the statute may seem onerous to defendants in its operation does not render it unconstitutional. In *Grigsby v. Mitchum,* 191 Kan. 293, 380 P. 2d 363, this court, in upholding the constitutional validity of a municipal ordinance imposing a license fee, stated:

"Almost every exercise of the police power will necessarily either interfere with the enjoyment of liberty or the acquisition, possession and production of property, or involve an injury to a person, or deprive a person of property within the meaning of the Fourteenth Amendment to the Constitution of the United States. Nevertheless, it is well settled that an exercise of the police power having such an effect will be valid if it bears a real and substantial relation to the public health, safety, morals or general welfare of the public, and if it is not unreasonable or arbitrary.

"Whether an exercise of the police power does bear a real and substantial relation to the public health, safety, morals or general welfare of the public, and whether it is unreasonable or arbitrary are questions which are committed in the first instance to the judgment and discretion of the legislative body, and, unless the decisions of such legislative body on those questions appear to be clearly erroneous, the courts will not invalidate them." (p. 302.)

Defendants emphasize there is no charge or proof of fraud against them, but this has no bearing. At 16 C. J. S., Constitutional Law, § 198, it is stated:

"In determining the constitutionality of a statute bearing on its face clear indication that it was designed to prevent fraud, the court, may not give weight to the fact that fraud was neither charged nor proved." (p. 968.)

We think the case of *Gilbert v. Mathews,* supra, is distinguishable from the case at bar. In that case the court held that although the legislature made a reasonable classification in the enactment of the particular statute, it placed unreasonable and arbitrary burdens upon the particular class of retailer, namely, itinerant merchants or auctioneers, and was therefor bad. Here, there is no attempt at classification and whatever burdens there be are placed uniformly

on all engaged in the particular enterprise, whether cemetery operator, funeral director, undertaker or what, and we cannot say they are unreasonable and arbitrary.

Most of the states have now enacted statutes similar to those under consideration, and where constitutionality has been attacked the majority have been upheld. In addition to *Memorial Gardens Ass'n v. Smith*, supra, see *Falkner v. Memorial Gardens Association*, 298 S. W. 2d 934 (Tex. Ct. Civ. App. [1957]); *Reserve Vault Corp. v. Jones*, 234 Ark. 1011, 356 S. W. 2d 225, (1962); and *Messerli v. Monarch Memorial Gardens, Inc.*, 88 Ida, 88, 397 P. 2d 34, (1964); although a contrary result was reached, as to a much more restrictive statute, in *State v. Gateway Mortuaries, Inc., et al.*, 87 Mont. 225, 287 Pac. 156, 68 A. L. R. 1512, (1930); and with strong dissent, in *State v. Memorial Gardens*, 143 W. Va. 182, 101 S. E. 2d 425, 68 A. L. R. 2d 1233, (1957).

Summing up, we consider the statutes to be a valid method of regulation of the business in question and not a prohibition, that is to say, they are reasonable regulations within the scope of the police power, fairly designed to protect the public from evils which otherwise might occur.

We have not overlooked defendants' contention the statutes are unconstitutional as being in violation of the mandate (Constitution of Kansas, Art. 2, § 16) that no bill shall contain more than one subject which shall be clearly expressed in its title, but consider it to be without merit.

2. Defendants contend by way of cross-appeal that K. S. A. 16-301, *et seq.* do not apply to their type of sale or burial vaults under the particular contracts in question. They argue the statutes embrace only contracts "wherein the delivery of the personal property or the funeral or burial merchandise . . . is not immediately required," and that the property sold under their contracts is subject to delivery on demand at any time after the purchase price is paid. They state in their brief "there is no provision for delivery upon death."

The contracts do provide for delivery of the merchandise to the purchaser, *"his heirs or assigns,"* upon the request of the purchaser, *"his heirs or assigns,"* after full payment. (Our emphasis.) They also contain the following provision:

"BURIAL VAULTS: That upon the request of the Purchaser, his heirs or assigns, if enumerated and designated above as purchased, the Company will erect, complete and permanently install in and upon the designated interment

spaces in Roselawn Memorial Gardens _____ Burial Vaults of adult size 30" or less in width and 86" or less in length. Said Vaults shall be constructed of best quality fiberglass, bell type, and finely finished in appropriate color; or it shall be such other type permanent Vault of equal quality as may be in common use by and in the cemetery at the time the Vaults hereby contracted for are delivered and installed at the cemetery."

The contracts further contain an escalator clause which provides that if the costs of the merchandise at the time of delivery are more than fifteen percent higher than the cost at the date of the contract, the purchaser shall pay the increase in cost above the fifteen percent, and they also contain what is called a guarantee of performance clause providing for the merchandise trust, already mentioned. They include a so-called transfer clause wherein defendants agree that if purchasers move out of the area served by defendants, the latter will upon request of one of the purchasers, accompanied by a proper death certificate, undertake to furnish comparable burial merchandise in another cemetery or refund seventy-five percent of all money received.

Bare recital of these contract provisions makes it abundantly clear that the contracts, whether fully paid or not, are of the character contemplated by the statute, that is, contracts whereby the delivery of the merchandise is not immediately required. For example, the merchandise trust provision manifestly presupposes nondelivery of the merchandise. Considering the subject matter, the contracts clearly contemplate delivery of the property when actually needed. No other interpretation can reasonably be placed upon them. The remote but highly improbable exercise of the right given to the purchaser to demand his burial vault in advance of death does not change the real nature of the contract. Here again, as stated in A. 2 above, a statute will not be construed so as to defeat its unmistakable intention. In arguing that the statute is inapplicable to their operations defendants ignore the fact it covers contracts providing for *installment* payments as well as lump sum payments, whereas under the contracts delivery will not be made until after full payment of the entire purchase price. More could be said but the matter will not be further labored. Of course, in the unlikely event of immediate delivery of the merchandise then, we scarcely need point out, the statute is inoperable by its own terms. The trial court committed no error in ruling the sale of burial vaults subject thereto.

### C. *Insurance.*

Plaintiff alleged in its original petition that defendants were engaged in the insurance business in violation of our insurance code (K. S. A. 40-101, *et seq.*) inasmuch as they are not authorized to conduct such a business or to sell insurance in Kansas, and plaintiff sought to enjoin its continuation. This claim is based partially on the theory that the entire operation amounts to the conduct of an insurance business and partially on a so-called family protection agreement in defendants' contracts. This in substance provides defendants will, upon proof being furnished of the death of the purchaser during the life of the contract, cancel payment of all balances not then past due under the contract and deliver the property constituting its subject matter, provided that ten percent (twenty percent in some instances) or more of the total purchase price shall have been paid with no payment delinquent more than thirty days, and provided further that the purchaser was in good health and not more than sixty-five years of age at the time said contract was executed. Plaintiff claims this constitutes an indemnity contract and thus within the scope of our laws regulating insurance. Defendants are not licensed to sell insurance or to conduct any kind of insurance business.

On this point in its journal entry of judgment the trial court found:

"The law and facts do not require that the defendants be enjoined from providing in their contracts for the cancellation of indebtedness upon the death of a debtor and injunction based upon such claim is denied."

Additionally, the court in a very helpful memorandum decision discussing the equity of granting the requested injunction found:

"The cancellation of indebtedness feature of defendents' contracts is incidental to the real purpose of such contracts and is truly minor. No specific charge is made to the purchaser for the incorporation of such agreement into the contract. . . ."

The court made no specific finding as to whether or not defendants were conducting an insurance business.

At pretrial conference an agreement between the parties was made that the provision in question was a "sales gimmick" and was an inducement to the potential purchaser. It was also agreed that after the institution of this lawsuit defendants purchased from a Kansas qualified life insurance company credit life insurance on all outstanding unpaid sales contracts.

Our statutes do not specifically define insurance but K. S. A. 40-201, defines an insurance company as follows:

"For the purposes of this article the term 'insurance company' shall, unless otherwise provided, apply to all corporations, companies, associations, societies, persons or partnerships writing contracts of insurance, indemnity or suretyship upon any type of risk or loss. . . ."

The term *insurance* has been judicially defined as any contract whereby one party promises for a consideration to indemnify the other against certain risks (*The State, ex rel., v. Ins. Co.*, 30 Kan. 585, 2 Pac. 840) and the court has had occasion to consider certain enterprises held to constitute the conduct of an insurance business. In *The State v. Burial Association*, 73 Kan. 179, 84 Pac. 757, an undertaker established an association wherein, upon payment of assessments classified by age, members were given a certificate entitling them to burial services. Assessments were to be paid during the lifetime of the members as needed, and the right to receive burial benefits was dependent upon the payment of all assessments levied, all rights being forfeitured upon cessation of payments. A case of like import is *The State v. Burial Association*, 79 Kan. 28, 98 Pac. 1134. In these cases it appears members of the associations were required to pay specific assessments during their lifetime in order to avail themselves of the benefits and that the real and only purpose of the associations was to pay expenses for burial services. These cases are illustrative of situations held to constitute the conduct of a burial insurance business, but they are not helpful as to any claim for insurance regulation based solely on the inclusion in the contract of the family protection agreement. Most of the cases cited by plaintiff make no such distinction and plaintiff's principal argument is in fact premised on the general claim that the entire operation amounts to the conduct of an insurance business. It may be conceded the whole enterprise, the pre-need sale of burial property, bears some analogy to insurance, but this alone is not sufficient to bring it within the realm of the insurance industry.

While the definition of insurance must perforce be a very broad general one, it does not necessarily follow that every contract which contains some technical element of indemnity or insurance is an insurance contract for the purpose of state regulation.

In 44 C. J. S., Insurance, § 59, at page 528, we find this:

"Whether a company is engaged in the insurance business depends . . . on the character of the business that it transacts . . . and whether the assumption of a risk, or some other matter to which it is related, is the principal object and purpose of the business."

In *Jordan v. Group Health Ass'n*, 107 F. 2d 239, the court in considering whether a group health association was conducting an insurance business said this:

"That an incidental element of risk distribution or assumption may be present should not outweigh all other factors. If attention is focused only on that feature, the line between insurance or indemnity and other types of legal arrangement and economic function becomes faint, if not extinct. This is especially true when the contract is for the sale of goods or services on contingency. But obviously it was not the purpose of the insurance statutes to regulate all arrangements for assumption or distribution of risk. That view would cause them to engulf practically all contracts, particularly conditional sales and contingent service agreements. The fallacy is in looking only at the risk element, to the exclusion of all others present or their subordination to it. The question turns, not on whether risk is involved or assumed, but on whether that or something else to which it is related in the particular plan is its principal object and purpose. . . . 'Care must be taken to distinguish mere contracts to render service on the happening of a contingency from true contracts of insurance. . . . The cases have failed to declare a satisfactory rule for distinguishing between the two types of agreements, but it would seem that the contract should not be classed as insurance if the paramount purpose in its formation was to be the rendition of the services rendered. . . . However, it should be insurance if the chief purpose of the agreement is the protection against the risk involved. . . .' [Note No. 26]" (pp. 247, 248.)

One of the normal elements of insurance is payment of a premium, that is, a consideration for the risk borne. This premium is usually based on the age of the person whose life constitutes the risk. These features are missing here, as specifically found by the trial court.

Upon the facts presented in this record we think the principal object and purpose of the business of defendants is basically that of selling cemetery lots, burial vaults and markers, and not that of assumption of risks; the latter being merely incidental to the former, or as the parties themselves put it, a "sales gimmick" or an inducement to the potential customer to buy the merchandise. We have just held defendants accountable under K. S. A. 16-301 for all moneys received for burial vaults and markers not delivered, and under K. S. A. 17-1311 for at least ten percent of money received for lots. To this extent this in effect constitutes the setting aside of reserve funds for the protection of contract holders. The establishment of reserves in the insurance business is, of course, one of the main purposes and objects of state regulation. If the legislature had considered pre-need contracts to furnish such property as being

within the realm of state insurance regulation there would have been little occasion for the enactment of K. S. A. 16-301. This may be considered some indication of legislative intent as to what is embraced within the insurance code. The entire subject is within legislative compass and further supervision should be left to legislative direction. We cannot say the trial court erred in declining injunctive relief in this area.

The orders of the trial court upon appeal and cross-appeal are affirmed with the exception that its order holding K. S. A. 16-301 to 16-304, inclusive, to be unconstitutional and void is reversed with directions to grant the relief under those statutes requested by plaintiff against defendants in accordance herewith.

APPROVED BY THE COURT.

KAUL, J., dissenting in part and concurring in part: I dissent from syllabi 10, 11 and 12 and related portions of the court's decision holding that the protection agreements included in the contracts under consideration do not amount to contracts of insurance.

The protection agreements in substance provide that the indebtedness remaining under the sales agreements shall be canceled upon proof being furnished of the death of the purchaser during the life of the contract, provided that the purchaser was in good health and not more than 65 years of age at the time of the execution of the contract. In some agreements payment of ten percent or more of the purchase price is required and in others twenty percent is required. Cancellation of indebtedness is forfeited if a payment was delinquent for more than thirty-one days.

A search of authorities reveals the majority rule clearly appears to be that a contract providing for cancellation of indebtedness on the death of the obligor is a contract of insurance. (See 29 Am. Jur., Insurance, § 9, p. 438; Couch on Insurance 2d § 1:14.) Supporting cases from many jurisdictions may be found in the following annotations: 35 A. L. R. 1039; 63 A. L. R. 726; 100 A. L. R. 1449 and 119 A. L. R. 1241.

It is my view that the tenor of the Kansas Statute and prior decisions of this court dealing with the subject indicate that the rule should be followed in this jurisdiction and applied to the contract under consideration.

In Kansas any contract of indemnity or suretyship upon *any type of risk or loss* is deemed a contract of insurance. (K. S. A. 40-201.)

The attitude of this court in defining contracts of insurance was

first evidenced in 1883 in the case of *The State, ex rel., v. Ins. Co.,* 30 Kan. 585, 2 Pac. 840.

The question was next considered in *The State v. Burial Association,* 73 Kan. 179, 84 Pac. 757, in which it was stated on page 181 of the opinion:

"If the certificate of membership issued by this burial association be designated a 'policy,' the assessment a 'premium,' and those who are relieved from paying the funeral expenses of the deceased member 'beneficiaries,' this association, both in general plan and phraseology, would be a substantial duplicate of the ordinary mutual-insurance company.

"The fact that no beneficiary is specifically named deserves little consideration, since in reality one exists, and may be ascertained with as much certainty as if directly and specifically mentioned. Whoever would otherwise pay the burial expenses of the deceased member is, by being relieved of that burden, as directly benefited to the amount of such expenses as if the cash were paid immediately to such person. If the deceased member leave an estate, the whole thereof, undiminished by the burial expenses which would otherwise be paid therefrom, will be received by his heirs. If he leave no estate, then his immediate relatives and friends who would otherwise have to furnish the expenses of his burial will be benefited by being relieved of that burden."

Applying the above quoted language to the contract at hand, if the "protection agreement" be designated a "policy," the payments "premiums" and those who are relieved from paying the unpaid balance "beneficiaries," the result is an agreement that must be considered a contract of insurance within the purview of K. S. A. 40-201 and *The State v. Burial Association,* supra.

It is argued that the cancellation of indebtedness on death agreement was only a "sales gimmick" and incidental to the overall purpose of the sales contract. I cannot agree that the relative importance or incidental nature of a contract is a valid premise upon which to base a determination of whether or not it constitutes insurance.

The judgment of the trial court should be reversed on this point and remanded with instructions that defendants be enjoined from issuing contracts providing for cancellation of indebtedness on the event of death of the purchaser. It is noted from the record that defendants have complied with request of plaintiffs in providing insurance coverage for contracts in existence.

I concur with the court's decision in all other respects.

FATZER, J., joins in the foregoing dissenting and concurring opinion.