Herby BERRYHILL and Lucille
Berryhill, Plaintiffs-Appellees,

v.

RICH PLAN OF PENSACOLA, a corporation, et al., Defendants-Appellants.

No. 76-3046.

United States Court of Appeals,
Fifth Circuit.

Aug. 24, 1978.

Rehearings Denied Oct. 11, 1978.

1094

Mayer W. Perloff, T. Dwight Reid, Mobile, Ala., Joseph J. Lyman, Washington, D. C., for defendants-appellants.

Irving Silver, Lawrence B. Voit, Irvin Grodsky, Mobile, Ala., for plaintiffs-appellees.

Before WISDOM, THORNBERRY, and RUBIN, Circuit Judges.

WISDOM, Circuit Judge:

In this case, we affirm the district court's finding that Herby and Lucille Berryhill are entitled to recover statutory penalties as well as attorney's fees from Rich Plan of Pensacola for Rich Plan's violation of the Truth-In-Lending Act, 15 U.S.C. § 1605(a) (1976); Regulation Z, 12 C.F.R. § 226.4(a) (1977); [1] and the Alabama Consumer Finance law, Ala.Code tit. 5, §§ 316 and 330 (Supp.1973). We conclude, however, that the district court made an erroneous penalty award for the violation of Alabama law and reduce the judgment accordingly.

I

Rich Plan of Pensacola (Rich Plan) is a corporate franchisee of Rich Plan Corporation. It sells frozen food in quantity to home consumers. Although it offers to sell food for either cash or on credit, an over-

1. The Federal Reserve Board promulgated Regulation Z, 12 C.F.R. §§ 226.1–226.1002 (1977), to implement the Truth-In-Lending Act.

whelming proportion of the Rich Plan sales are to credit customers.

After the Berryhills responded to a solicitation from Rich Plan, a Rich Plan salesman called on them at home. The Berryhills agreed to subscribe to Rich Plan's food service. They already owned a home freezer in which they planned to store the food.

The Berryhills signed two contracts with Rich Plan. The first, the "Food Plan Contract", was the actual order for the food the Berryhills wanted to buy. The Berryhills received food and made payments under this contract for six months. The Berryhills also signed a "Food and Freezer Service Agreement". Rich Plan would not sell the first Food Plan Contract unless the Berryhills entered into a Food and Freezer Service Agreement. This "Service" included twelve "benefits", ("obligations" of Rich Plan) entitling the Berryhills to:

1. purchase Rich Plan's premium and quality foods;
2. have all meats custom cut and packaged to fit the Berryhills' requirements;
3. receive all meats wrapped in film or heavy-duty freezer wrap after flash freezing at subzero temperatures;
4. receive home deliveries of all food orders exceeding $100;
5. have delivery of all frozen foods in refrigerated trucks and insulated containers to be placed in the Berryhills' home freezer by Rich Plan's delivery man;
6. return any unused food that did not meet the Berryhills' complete satisfaction within four months of delivery;
7. purchase all food orders exceeding $100 on credit, subject to credit approval;
8. receive price lists and order forms periodically highlighting specials;
9. receive assistance in the details of reordering food by mail or phone;
10. receive a Rich Plan identification card permitting the Berryhills to purchase food from any other Rich Plan franchisee without the necessity of purchasing an additional Food and Freezer Service Agreement;
11. receive help from Rich Plan Corporation and the National Institute of Locker and Freezer Provisioners to obtain supplies of food under the plan if the Berryhills moved to another area without a Rich Plan franchisee; and
12. call upon Rich Plan to defray all labor costs and charges for mechanical repairs to the Berryhills' home freezer for three years whether or not they purchased food from Rich Plan and thereafter provided they purchased their major food needs from Rich Plan on a regular basis. The cost of parts for the freezer not covered by the Berryhills' manufacturer's warranty were not covered in the Food and Freezer Service Agreement either.

In addition, Rich Plan agreed to obtain for the Berryhills "at no additional cost" insurance for loss of food up to $300 resulting from a mechanical breakdown of the freezer or an electrical power failure. This insurance was to last three years from the effective date of the Food and Freezer Service Agreement. There is evidence in the record that the Rich Plan salesman referred to the entire Food and Freezer Service Agreement as "insurance".

The cash price for the six-month Food Plan Contract signed by the Berryhills would have been $418.14. The cash price for a Food and Freezer Service Agreement would have been $399.00. Because the Berryhills bought on credit, their total cost was $451.47 for the Food Plan Contract and $485.68 for the Food and Freezer Service Agreement. Rich Plan's counsel conceded at oral argument that the Food and Freezer Service Agreement is by far the most profitable element of the transaction. Rich Plan properly completed the Food and Freezer Service Agreement before extending credit for it to the Berryhills. It disclosed a finance charge of $31.09 at an annual rate of 23.75 percent. The Berryhills did not receive a properly completed

Food Plan Contract, however, until almost two weeks after credit had been extended. The partially completed form for the Food Plan Contract left by the Rich Plan salesman with the Berryhills did not disclose the cash price, the cost of credit life insurance that the Berryhills requested Rich Plan to obtain for them, the amount to be financed, and the finance charge. The completed form disclosed that the finance charge for the Food Plan Contract was $31.09, an annual rate of 23.75 percent. Neither the partially completed nor the fully completed Food Plan Contract disclosed that before extending credit Rich Plan required a buyer (1) to obtain insurance or a service agreement for the buyer's freezer or (2) to pay a membership fee.

The Berryhills received the food they ordered from Rich Plan. They were not satisfied with the delivery service or the quality of the merchandise. They did not, therefore, purchase any additional food after the first contract expired. The Berryhills continued to pay for the Food and Freezer Service Agreement, although they did not wish to do so since they were no longer ordering Rich Plan food. The Berryhills believed they were entitled to a credit toward the cost of a Rich Plan appliance from the second half of their payments on the Food Freezer Service Agreement. When Herby Berryhill inquired about the credit, he was told that his contract did not give him such a benefit.[2] There is no evidence in the record to show that the Berryhills ever wrote Rich Plan before commencing this lawsuit to assert that the charge for the Food and Freezer Service Agreement was actually part of the finance charge for the Food Plan Contract, or to demand a refund of any interest over 15 percent charged on the Food Plan Contract in violation of Alabama law.

The Berryhills brought this lawsuit, alleging numerous grounds for recovery under the Truth-In-Lending Act and the Alabama Consumer Finance law. Rich Plan concedes

that the Food Plan Contract violated the Truth-In-Lending Act. The Berryhills argued, and the district court agreed, that Rich Plan further violated the Truth-In-Lending Act and Regulation Z in failing to include the entire cost of the Food and Freezer Service Agreement in the finance charge disclosed for the Food Plan Contract. The district judge reasoned that obligations numbered one through nine and eleven of the Food and Freezer Service Agreement were not materially different from the obligations assumed by Rich Plan in the sale and marketing of the Food Plan Contract itself. The district judge further found that obligation number ten of the Food and Freezer Service Agreement was an illusory obligation, not sufficient to stand as a separate consideration for the Food and Freezer Service Agreement. The court found that obligation number 12 and the promise to obtain spoilage insurance were in essence, insurance that the freezer would function. The insurance, according to the district court, served to protect the security interest that Rich Plan retained in the food sold under the Food Plan Contract.

The defendant did not disclose in a clear, specific written statement to the Berryhills the cost of any required freezer insurance. Nor did Rich Plan state that the Berryhills would be free to choose the person through which such insurance would be obtained. The district court found that without these disclosures the cost of the Food and Freezer Service Agreement should have been included in the finance charge for the Food Plan Contract because it was mandatory insurance, and that the failure to do so violated the Truth-In-Lending Act. 15 U.S.C. §§ 1605(a) and (c).

The Truth-In-Lending Act sets a penalty for violations of its disclosure requirements at twice the amount of the finance charge in connection with the transaction, with a minimum liability of $100 and a maximum liability of $1,000, as well as costs and a reasonable attorney's fee. 15 U.S.C. § 1640.

---

**2.** The district judge concluded that the Berryhills were not entitled to any credit toward the cost of a Rich Plan appliance.

When the cost of the Food and Freezer Service Agreement is included in the finance charge for the Food Plan Contract, that finance charge totals $516.77, and the appropriate Truth-In-Lending Act penalty is $1,000.

In addition, the district judge found that the Food and Freezer Service Agreement constituted impermissible insurance under the Alabama Consumer Finance statute, Ala.Code tit. 5, § 331. As a result, under Alabama law the charge for the Food and Freezer Service Agreement is also part of the finance charge for the Food Plan Contract. The finance charge with the addition of the charge for the Food Plan Contract exceeds the maximum finance charge of 15 percent allowed by Ala.Code tit. 5, § 317. The district judge interpreted Ala.Code tit. 5, § 330 to set a penalty for this violation equal to ten times the amount of the excess finance charge, a total of $4,852.50.

The district court awarded the Truth-In-Lending Act penalty and the Alabama penalty to both Herby and Lucille Berryhill because they were joint obligors on the note. In addition, the district judge awarded attorney's fees of $2,900. The total judgment against Rich Plan equalled $14,605.

## II

Rich Plan has four major objections to the district court's reasoning and result.[3] (A) First, Rich Plan argues that the district court erred when it characterized the Food and Freezer Service Agreement as an insurance policy rather than a service contract or a membership fee. (B) Next, and importantly, Rich Plan contends that whether the Food and Freezer Service Agreement is insurance, a service agreement, or a membership fee, it is not a charge imposed as "an incident to or as a condition for the extension of credit". If the charge for the Food and Freezer Service Agreement is not an "incident" to the extension of credit, it is not part of the finance charge under 15

U.S.C. § 1605(a), 12 C.F.R. § 226.4(a)(6), or Ala.Code tit. 5, § 316. (C) Rich Plan argues that the district court improperly doubled the Berryhills' recovery. Rich Plan reasons that joint obligors should recover a single statutory penalty only, rather than a separate penalty for each. (D) Finally, Rich Plan contends that the judge should not have awarded the Berryhills ten times the excess finance charge for the Alabama violation because the Berryhills did not make a written demand for a refund as required by the Alabama statute as a prerequisite for that penalty.

## A

■ On the merits, we find sufficient evidence in the record to support the district court's conclusion that the provisions numbered one through nine and eleven in the Food and Freezer Service Agreement duplicate benefits provided by the Food Plan Contract itself. If obligation ten is not illusory, it is, at most, the granting of "membership" privileges. We see more complexities than did the district court in the question whether the remaining obligations to obtain spoilage insurance and to defray labor costs and charges for mechanical repairs to the Berryhills' freezer constitute insurance or a service agreement. Past cases have failed to establish a clear line between these two types of agreements. After one of the more detailed examinations of the difference between an insurance contract and a service agreement, the Court of Appeals for the District of Columbia Circuit concluded that "the question turns, not on whether risk is involved or assumed, but on whether that or something else to which it is related in the particular plan is its principal object and purpose". *Jordan v. Group Health Association*, 1939, 71 App.D.C. 38, 107 F.2d 239. *See also Transportation Guarantee Co. v. Jellins*, 1946, 29 Cal.2d 242, 174 P.2d 625 (en banc); *State v. Anderson*, 1966, 195 Kan. 649, 408 P.2d 864; R. Keeton, *Basic Text on*

---

**3.** Rich Plan's other contentions, including its arguments that the district court exceeded its authority in its examination of the substance of Rich Plan's business and that the district court lacked jurisdiction to consider the Alabama claims, lack any merit.

*Insurance Law* § 1.2(c) (1971); Note, 3 U. of Pitt.L.Rev. 250 (1936).

Fortunately, we need not struggle with this ambiguous distinction. Whether the Food and Freezer Service Agreement constituted an insurance contract, a service agreement, or, as first suggested at oral argument, a membership fee, does not change the need to disclose it as part of the finance charge for a Rich Plan Food Plan Contract.

 The Truth-In-Lending Act and the Alabama Consumer Finance law define "finance charge" in almost identical terms. Under the Truth-In-Lending Act, the finance charge consists of the "sum of all charges, payable directly or indirectly by the person to whom the credit is extended, and imposed directly or indirectly by the creditor as an incident to the extension of credit . . .". 15 U.S.C. § 1605(a).[4] The finance charge under the Alabama statute includes "all charges payable directly or indirectly by the debtor and imposed directly or indirectly by the creditor as an incident to the extension of credit . . .". Ala.Code tit. 5, § 316(a). The language of both statutes is broad enough to include a service agreement or membership fee imposed as a condition before credit is extended. *See Carney v. Worthmore Furniture, Inc.,* 4 Cir. 1977, 561 F.2d 1100; Federal Reserve Board Public Information Letter No. 773 (April 4, 1974).[5] On its face, the Food and Freezer Service Agreement is such a condition, since Rich Plan would not sell to the Berryhills on credit until they purchased a Service Agreement.

## B

 Rich Plan responds that "a cursory examination" of its method of doing business shows that the Food and Freezer Service Agreement is not a charge imposed as an incident to the extension of credit, but an independent transaction. Rich Plan emphasizes three facts to support this theory: (i) a customer need buy a Food and Freezer Service Agreement only in conjunction with his first Food Plan order; (ii) cash customers are not relieved of the requirement that they buy a Food and Freezer Service Agreement with their initial order; and (iii) the payments for and benefits from the Service Agreement extend beyond the term of the Berryhills' Food Plan Contract. None of these factors severs the connection between the Food and Freezer Service Agreement and the Food Plan Contract that makes the Service Agreement charge part of the finance charge for the food order under federal and Alabama law.[6]

 It is true that Rich Plan requires a customer to sign a Food and Freezer Service Agreement in conjunction with his first food order only, and not for each subsequent order. We fail to see any signifi-

---

4. The definition of a finance charge in Regulation Z is identical, except that Regulation Z includes charges imposed "as an incident to or as a condition of the extension of credit . . .". 12 C.F.R. § 226.4(a).

5. Rich Plan draws the Court's attention to Official Staff Interpretation No. FC–0129 (November 2, 1977) and Official Staff Interpretation No. FC–0019 (November 12, 1976). In those interpretations, the staff of the Federal Reserve Board concluded that service contracts for automobiles sold at the time the automobiles were purchased need not be included in the finance charge. These interpretations are not applicable to the case before us because the automobile service agreements were completely optional with the vehicle buyers.

6. Rich Plan stresses that the Food and Freezer Service Agreement provided that Rich Plan would obtain food spoilage insurance for the customer "at no additional cost". Rich Plan argues that this feature means the Food and Freezer Service Agreement falls under Federal Reserve Board Public Information Letter No. 167 where the Federal Reserve staff concluded "if the creditor simply absorbs the cost of . . . insurance coverage by including such coverage in his rate and treats all customers alike, the cost of such insurance need not be itemized in disclosing the amount of the finance charge in those cases where the finance charge is required to be disclosed". This letter does not help Rich Plan. Rich Plan not only failed to itemize the charge, it failed to disclose it altogether. We do not read Letter No. 167 to sanction such a failure. to disclose. Moreover, the Food and Freezer Service Agreement as a whole can hardly be characterized as insurance the cost of which is absorbed by the lender and included in his rate.

cance to that fact for the issue before us. Rich Plan concedes that it required the Berryhills to sign a Food and Freezer Service Agreement before they could buy food on credit from Rich Plan. That Rich Plan would not exact a similar charge before they would extend credit a second time does not erase the requirement for the first transaction.

■ Rich Plan argues that the Food and Freezer Service Agreement is unrelated to the extension of credit, as shown by the fact the agreement is also required of cash customers. We find an answer to that argument in *Carney v. Worthmore Furniture, Inc.*:

> [The] claim that the service policy is not an incident to the credit transaction [because the service policy is required of cash and credit customers] might have more appeal if [the defendant] were able to offer documented evidence of a substantial cash business in which identical charges for service policies were levied in each sales transaction. *See Manzina v. Publishers Guild, Inc.*, 386 F.Supp. 241 (S.D.N.Y.1974). However, where as here the alleged cash sales are insignificant exceptions to what is apparently a credit sales business, the naked claim that the service policy charge is imposed on cash customers is insufficient to acquit it as not incident to the extension of credit. *See Kriger v. European Health Spas, Inc.*, 363 F.Supp. 334 (E.D.Wis.1973); *Strompolos v. Premium Readers Service*, 326 F.Supp. 1100 (N.D.Ill.1971).

561 F.2d at 1103. Although *Carney* interprets only the federal Truth-In-Lending Act, we find its reasoning equally applicable to the identical language defining "finance charge" in the Alabama Consumer Finance law.

The record does not show what percentage of Rich Plan's business is on credit. Rich Plan's counsel conceded during oral argument, however, that the number of cash sales is insignificant. In addition, the description of Rich Plan's operations given by Rich Plan witnesses at trial proceeds on the assumption that virtually all sales are made on credit. In this factual context, Rich Plan's formal requirement that cash customers also purchase a Food and Freezer Service Agreement is no more helpful to its position than was Worthmore Insurance Company's similar policy.

■ In *Carney*, the term of the compulsory service agreement coincided with the repayment schedule for the loan. Rich Plan would distinguish *Carney* from this case because both the payments for and benefits from the Food and Freezer Service Agreement extend longer than the payments on the Berryhills' food order. Again, Rich Plan makes a correct factual observation, but we fail to see its legal significance for the question before us. The important question is whether the seller refuses to extend credit until the customer agrees to another charge. The details of the manner in which the charge is imposed are irrelevant.[7] A creditor may not avoid the disclosure requirements of the Truth-In-Lending Act simply by imposing his charges in packages with terms that do not coincide with those of the underlying credit transaction.

■ We hold that Rich Plan's Food and Freezer Service Agreement is a charge imposed as an incident to the extension of credit on the Food Plan Contract that must be included in the finance charge for the Food Plan Contract. Rich Plan benefits from the Food and Freezer Service Agree-

---

7. The different payment schedules were a result of Rich Plan's merchandising strategy. Rich Plan wanted to limit the Berryhills' total monthly payment to an amount approximately equal to their budget for the same food before they subscribed to Rich Plan. At the same time, Rich Plan did not wish to bill the Berryhills for a food order after all the food had been consumed. If Rich Plan had compressed the payment schedule for the Food and Freezer Service Agreement to six months, the Berryhills' total payment would have been too high. On the other hand, if Rich Plan had proposed an eighteen month initial food contract to the Berryhills the total cost would have been so great that the Berryhills might have hesitated to sign and, even if they had, it might have been difficult for Rich Plan to sell the financing contract.

ment because its security interest in the frozen food is protected. Rich Plan's failure to disclose the entire service charge on the Food Plan Contract subjects it to penalties under both the Truth-In-Lending Act and the Alabama Consumer Finance law.

### C

■ In the absence of precedent to the contrary, we might accept Rich Plan's position that the Berryhills should recover only one statutory penalty between them. *See St. Marie v. Southland Mobile Homes, Inc.,* E.D.La.1974, 376 F.Supp. 996. This Court has held, however, that when a husband and wife are jointly and severally liable for the entire debt each is a borrower under the Truth-In-Lending Act to whom disclosure is due. And each is entitled to a penalty if there is a statutory violation. *Davis v. United Companies Mortgage and Investment of Gretna, Inc.,* 5 Cir. 1977, 551 F.2d 971, 972–73.

■ The district court also awarded two penalties for the violation of the Alabama statute. There is no applicable Alabama precedent. *Davis* interprets only the federal Truth-In-Lending Act, but we find its logic applicable to the Alabama statute as well. Ala.Code, tit. 5, § 330 provides that a creditor in violation of the Consumer Finance law shall pay the enumerated penalty to "the debtor". Under Alabama law, both Herby and Lucille Berryhill were jointly and severally liable for the entire debt. *See Rhodes v. Tomlin,* 1958, 267 Ala. 491, 102 So.2d 904, 906–08. Therefore, Herby and Lucille Berryhill were each a "debtor" to Rich Plan and each may recover an Alabama penalty.

### D

We agree with Rich Plan, however, that the district court awarded the wrong Alabama penalty. Under Ala.Code tit. 5, § 330 when a creditor charges an impermissibly high finance charge the normal penalty is a refund to the debtor of the total amount of the finance charge. The Alabama law provides for heavier penalties in two circumstances: (1) if the creditor has made an excess finance charge in deliberate violation or reckless disregard of the law, the creditor also forfeits the principal of the loan; (2) if the debtor is entitled to a refund and the creditor refuses to refund within a reasonable time after written demand, the debtor recovers a penalty equal to either twice the finance charge or ten times the amount of the excess charge whichever is greater, together with a reasonable attorney's fee.[8]

■ The district judge awarded this second special penalty even though there is no evidence in the record that the Berryhills made a written demand to Rich Plan for a refund. The Berryhills' counsel argues that the complaint filed in this case supplied the necessary written demand. This argument is totally inadequate. The requirement that a borrower make a written demand upon a creditor for the refund of usurious interest is not a meaningless formality. It gives the creditor an opportunity to comply with the law without interference from the courts and the expense of a lawsuit. This opportunity has been lost when the complaint is filed because the lawsuit has al-

---

8. Ala.Code tit. 5, § 330 provides as follows: Any creditor charging a finance charge in excess of the amount authorized herein except as the result of an accidental and bona fide error in computation, shall forfeit his right to any finance charge and shall refund to the debtor the total amount of the finance charge, which may be done by reducing the amount of the debtor's principal obligation. If the debtor is entitled to a refund and the creditor refuses to refund within a reasonable time after written demand, the debtor may recover a penalty of either twice the finance charge or ten times the amount of the excess charge, whichever is greater, but in any event not less than $100, together with a reasonable attorney's fee. If the creditor has made an excess finance charge in deliberate violation of or in reckless disregard for this chapter, the creditor shall have no right to receive or retain the principal or any finance charge whatsoever and the transaction shall be void. No action under this section may be brought more than one year after due date of the last scheduled payment of the agreement pursuant to which the charge was made or in the case of open-end credit plans, one year after the excess charge is made.

ready begun. Moreover, if a legal complaint satisfied the written demand requirement in the Alabama statute, that requirement would be superfluous. Every lawsuit begins with a written complaint; thus under the Berryhills' interpretation the Alabama statute would add nothing to what a plaintiff must do to recover damages in the first place and the special penalty would always be available. There is no affirmative evidence of a lack of written demand, either, but we read the statute to require the *plaintiff* to show a demand was made and refused before the extra penalty is appropriate. The Berryhills did not establish that they were entitled to the special penalty, and the district court should not have awarded it.

■ The Berryhills point out that Rich Plan has not previously raised its objection to the Alabama penalty awarded by the district court. This Court usually refuses to consider a contention that was not raised before the trial judge. *See, e. g., Georgia Power Co. v. 54.20 Acres*, 5 Cir. 1977, 563 F.2d 1178, 1192. In this circumstance, however, the Berryhills' attorney called the judge's attention to the appropriate statutory provision. The trial judge, upon reading the provision, should have realized that the relief outlined by the Berryhills' counsel in his argument was not appropriate for the facts they had shown. Even though Rich Plan's counsel did not raise the point, the judge had sufficient information to award the proper penalty.

It is appropriate, therefore, for us to reduce the penalty under the Alabama statute to the amount of the finance charge, $516.77. With this modification, the Berryhills will recover two federal penalties of $1,000, two state penalties of $516.77, and a single award of $2,900 for attorney's fees, for a total judgment of $5,933.54. Even as modified, this judgment is a generous one for violations involving two contracts totalling $937.15.

The judgment is MODIFIED and as modified is AFFIRMED.

ALVIN B. RUBIN, Circuit Judge, concurring in part and dissenting in part:

While I agree with most of the majority opinion, I respectfully dissent in two particulars:

A.

For reasons set forth in *St. Marie v. Southland Mobile Homes, Inc.*, E.D.La.1974, 376 F.Supp. 996, I do not think that Congress, in the Truth-in-Lending statute, intended to exact a double penalty when a husband and wife enter into a single transaction. Like the majority, I am bound by the later formulation of the law of the circuit to the contrary. *Davis v. United Companies Mortgage and Investment of Gretna, Inc.*, 5 Cir. 1977, 551 F.2d 971, 972–73. However, I do not think that an Alabama court, unfettered by a federal circuit decision, would reach the same conclusion in interpreting its own statute, or that it would consider Herby and Lucille Berryhill separate debtors for the purposes of that statute, particularly when the consequent multiplication of the Alabama penalty would ensue. Candor, and, perhaps, vanity, compel me, as the author of *St. Marie*, to say that I think, under the circumstances, its logic would be more compelling to the Alabama court.

B.

I would not permit Rich Plan, represented by able counsel throughout, to urge the alleged error in interpreting the Alabama statute for the first time in this court. Mere citation of a statute (upon which the plaintiffs themselves relied) no more suffices to alert a court to an argument based on a technical interpretation of one of the clauses of that act than reference to a library suffices as a citation to one of its books.

The pleadings of counsel, who practice a learned profession, do not command the leniency of interpretation we accord the pro se, unlearned petitioner. The primary function of this court is to review doctrines for legal correctness and to state and apply the rule of law for the guidance of the

public, lawyers, litigants and trial courts. It is our related duty to assure justice in a particular case, but only when, for example, the trial court's findings are clearly erroneous, or a jury verdict lacks support in substantial evidence. It is not our duty, nor does it well serve the administration of justice, for us to consider issues not properly raised in the trial court in order to reach the "correct result." *See* Wright, The Doubtful Omniscience of Appellate Courts, 41 Minn.L.Rev. 751 (1957).

### C.

Application of these different views cuts both ways. The first would reduce the recovery allowed by my brethren; the second would increase it. The plaintiffs would reap an even more bountiful harvest than my colleagues permit. This does not cause me undue concern. In blunter terms, I view the so-called Food and Freezer Agreement as a sham to exact unconscionable charges from the credit buyer, who is the only one who ever pays them. We need not shrink from the consequences the defendant's overreaching has brought on itself.